VAN BUREN PUBLIC SCHOOL DISTRICT v WAYNE
CIRCUIT JUDGE

METROPOLITAN COUNCIL NO 23 AND LOCAL 1014, AMERICAN
FEDERATION OF STATE, COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO v VAN BUREN PUBLIC SCHOOL
DISTRICT

1. Labor Relations—Employment Relations Commission—Juris-
   diction—Unfair Labor Practices—Statutes.

   The Employment Relations Commission has exclusive jurisdiction
   over all unfair labor practices (MCLA 423.216).

2. Labor Relations—Circuit Courts—Preliminary Injunction—
   Jurisdiction—Employment Relations Commission—Unfair
   Labor Practices.

   A circuit court has jurisdiction to enter a preliminary injunction
   restraining an employer from discharging employees until a
   hearing on an unfair labor practices charge scheduled before

---

References for Points in Headnotes

[1] 48 Am Jur 2d, Labor and Labor Relations §§ 1191, 1196.
[2] 48 Am Jur 2d, Labor and Labor Relations §§ 899, 1003, 1012 *et
   seq.*
[2, 6–8] Mandatory injunction prior to hearing of case. 15 ALR2d 213.
[3] 48 Am Jur 2d, Labor and Labor Relations §§ 1404, 1426.
[4, 7, 8] 42 Am Jur 2d, Injunctions §§ 48, 49, 70.
[5, 8, 12, 14] 48 Am Jur 2d, Labor and Labor Relations §§ 728–730,
   1055.
   Employer's decision to have work done by independent contractors
   rather than by employees as unfair labor practice. 6 ALR3d 1148.
[6–8] 42 Am Jur 2d, Injunctions §§ 16, 22, 36.
[9, 10] 42 Am Jur 2d, Injunctions §§ 300, 320.
[11, 12, 14, 15] 48 Am Jur 2d, Labor and Labor Relations §§ 669, 686,
   700–702, 1191 *et seq.*
[13] 68 Am Jur 2d, Schools § 234 *et seq.*
   Transportation of school pupils at expense of public. 63 ALR 413, s.
   118 ALR 806, 146 ALR 625.
[15, 16] 48 Am Jur 2d, Labor and Labor Relations §§ 1171, 1186–1190.
[17] 48 Am Jur 2d, Labor and Labor Relations §§ 928, 929, 987–989,
   1055.
[18] 48 Am Jur 2d, Labor and Labor Relations § 1181 *et seq.*

the Employment Relations Commission where the circuit court does not seek to exercise jurisdiction over the merits of the charge and the injunction is issued in aid of the commission's jurisdiction.

3. COURTS—CIRCUIT COURTS—EQUITY—INJUNCTION—LABOR RELATIONS—STATUTES.

Circuit courts possess the traditional power of equity courts and are regularly requested to grant injunctive relief; it is not unusual for circuit courts to grant preliminary injunctions in labor disputes (MCLA 600.601).

4. INJUNCTION—EQUITY—IRREPARABLE INJURY—ADEQUATE REMEDY AT LAW—REPLACING EMPLOYEES.

An injunction cannot be granted unless the party requesting it satisfies the court that he will otherwise suffer irreparable injury and he does not have an adequate remedy at law.

5. LABOR RELATIONS—PRELIMINARY INJUNCTION—EMPLOYMENT RELATIONS COMMISSION—BARGAINING—DISCRETION—SCHOOLS AND SCHOOL DISTRICTS.

A circuit court did not abuse its discretion by issuing a preliminary injunction preventing a school district from terminating the employment of its bus drivers until an Employment Relations Commission hearing was held where the issue before the commission was whether the school district was required to bargain about its decision to replace the bus drivers with a private transportation firm, a decision by the commission requiring bargaining would have been nullified absent equitable relief, no back pay award or reinstatement order could restore the status quo since the school district's decision would have become irrevocable with the passage of time, and the alternative remedy through the commission was not immediately available.

6. INJUNCTION—PRELIMINARY INJUNCTION—EQUITY—STATUS QUO.

Equity regards the substance rather than the form of things, and the status quo which will be preserved by a preliminary injunction is the last actual, peaceable, noncontested status which preceded the pending controversy; equity will not permit a wrongdoer to shelter himself behind a suddenly or secretly changed status, though he succeeded in making the change before the court's hand actually reached him.

7. INJUNCTION—MANDATORY INJUNCTION—STATUS QUO—DISCRETION —EQUITY.

Mandatory injunctions are granted only when it is necessary to

preserve the status quo and where serious inconvenience and loss would result if the status quo were not preserved; a court can consider whether under all the facts and circumstances of the case the issuance of the injunction will maintain the parties in that status which is least likely to do irreparable injury to the party which ultimately prevails.

8. LABOR RELATIONS—INJUNCTION—PRELIMINARY INJUNCTION—MANDATORY INJUNCTION—CONTEMPT.

A preliminary injunction which required a school district to take affirmative steps to insure the continued employment of union bus drivers was proper where the costs to the union in not providing injunctive relief would have been considerable and any loss to the school district occasioned by the issuance of the preliminary injunction was due to the school district's imprudent actions and contemptuous conduct.

9. INJUNCTION—TERMS OF INJUNCTION—COURT RULES.

Every order granting an injunction must be specific in its terms and must describe in reasonable detail the act or acts sought to be restrained (GCR 1963, 718.9[2], [3]).

10. INJUNCTION—TERMS OF INJUNCTION—NOTICE.

A party may not complain that it was unaware of what an injunctive order required where the injunction clearly and unmistakably instructed the party in terms sufficiently specific and detailed to inform the party what was required and counsel for both parties specifically agreed with the trial judge on the record that the court had made its meaning clear in the order.

11. LABOR RELATIONS—PUBLIC EMPLOYMENT—COLLECTIVE BARGAINING—MANDATORY BARGAINING SUBJECTS—STATUTES.

A public employer is required to bargain with duly elected representatives of its public employees; certain issues in the collective bargaining process are by statute deemed so important to the resolution of labor disputes that they are considered mandatory subjects of bargaining (MCLA 423.215).

12. LABOR RELATIONS—COLLECTIVE BARGAINING—DECISION TO SUBCONTRACT—MANDATORY BARGAINING.

Three factors are crucial in determining whether an employer's decision to subcontract work that was formerly done by employees is a subject of mandatory bargaining: (1) if the decision to subcontract does not alter the employer's basic operation, (2) if there is no capital investment or recoupment, and (3) if the

employer's freedom to manage his business would not be significantly abridged by requiring bargaining.

13. SCHOOLS AND SCHOOL DISTRICTS—TRANSPORTATION—STATUTES.

Once the decision is made by a school district to bus any students, the district must provide transportation for all resident pupils; a school district cannot abandon the responsibilities imposed on it by statute by entering into a contract with a private transportation firm until the district decides to cease providing transportation to all of its students (MCLA 340.590a, 340.592, 340.594, 340.595, 340.598).

14. LABOR RELATIONS—BARGAINING—REPLACING EMPLOYEES—MANDATORY BARGAINING SUBJECTS—SCHOOLS AND SCHOOL DISTRICTS—UNFAIR LABOR PRACTICE.

A school district's decision to replace its bus drivers with a private transportation firm is a mandatory subject of bargaining between the school district and representatives of the bus drivers; failure of the school district to bargain with its bus drivers about this decision is an unfair labor practice (MCLA 423.215).

15. LABOR RELATIONS—EMPLOYMENT RELATIONS COMMISSION—AFFIRMATIVE ACTION—APPEAL AND ERROR—STATUTES.

Any affirmative action ordered by the Employment Relations Commission, including reinstatement of employees with or without back pay, must effectuate the policies of the public employment relations act; however, the commission's power is a broad, discretionary one, subject to limited judicial review (MCLA 423.216[b]).

16. APPEAL AND ERROR—LABOR RELATIONS—EMPLOYMENT RELATIONS COMMISSION—FINDINGS OF FACT—STATUTES.

The findings of the Employment Relations Commission with respect to questions of fact shall be conclusive if supported by competent, material and substantial evidence on the record considered as a whole; an order of the commission should not be disturbed unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the labor legislation (MCLA 423.216[e]).

17. LABOR RELATIONS—EMPLOYMENT RELATIONS COMMISSION—PUBLIC EMPLOYMENT—SCHOOLS AND SCHOOL DISTRICTS—BUS DRIVERS—ANTI-UNION ANIMUS—EVIDENCE.

There was competent, material and substantial evidence to support a finding of anti-union animus on the part of a school

district where the school district ignored repeated requests to bargain with its union bus drivers about the decision to hire a private transportation firm, refused to meet with union negotiators until legal proceedings were begun against the school district, notice of the disputed decision was never sent to the union even though the decision served to terminate the employment of the bus drivers' union, the disputed decision was conceded to be without economic justification, and the private firm hired nearly 50% of the former drivers but failed to hire any of the members of the negotiating team even though they had more job experience than other drivers.

18. LABOR RELATIONS—EMPLOYMENT RELATIONS COMMISSION—ORDER —TERMS.

An order of the Employment Relations Commission which directed a school district to reinstate bus drivers with back pay, rescind a contract with a private transportation firm, and bargain about the decision to hire the transportation firm was proper where anti-union animosity was shown, any less drastic measure would seriously disfavor the union and make bargaining a useless gesture, and it is equitable to favor that party which has done the least to create the dispute.

Appeals from Wayne, Horace W. Gilmore, J., and from Michigan Employment Relations Commission. Submitted Division 1 January 15, 1975, at Detroit. (Docket Nos. 15473, 15474, 18493.) Decided May 27, 1975.

Complaints by Metropolitan Council 23 and Local No. 1014, American Federation of State, County and Municipal Employees, AFL-CIO, against Van Buren Public School District seeking injunctive relief in circuit court for failure to honor a labor contract, and charging unfair labor practices before the Michigan Employment Relations Commission. Preliminary injunction granted and subsequently defendant was found guilty of contempt. Judgment for plaintiff before the commission. Complaint in the Court of Appeals by the school district against a Wayne County circuit

judge for an order of superintending control directing that the preliminary injunction and finding of contempt be set aside. This complaint was treated as an application for leave to appeal, which was granted. Defendant appeals from the judgment of the commission. Cases consolidated on appeal. Affirmed.

*Zwerdling, Maurer, Diggs & Papp,* for the union.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *Paul H. Townsend, Jr.,* and *Ronald J. Santo)* and *Tinkham, Snyder, MacDonald & Wilder,* for the school district.

Before: R. B. BURNS, P. J., and BRONSON and M. F. CAVANAGH, JJ.

BRONSON, J. These two cases involve the same parties and have been consolidated for decision on appeal. Together they present important questions concerning the method our Legislature has devised for resolving disputes between public employees and their employers and the extent to which the traditional powers of equity courts can be invoked to aid the disputants without interfering with that statutory procedure.

The Van Buren Public School District is a public employer within the meaning of the public employment relations act (PERA), MCLA 423.201, *et seq.;* MSA 17.455(1) *et seq.* Prior to the 1972–1973 school year, Van Buren had owned, operated and maintained a transportation system for the busing of about 95% of its approximately 8,000 students. It had employed some 58 persons to drive its buses. These bus drivers had since 1965 been members of, and represented for purposes of col-

lective bargaining[1] by, Metropolitan Council 23, and its Local No. 1014, American Federation of State, County and Municipal Employees, AFL-CIO. The last contract between Van Buren and the union covered the school year 1971–1972 with a termination date of August 25, 1972. It is undisputed that the union bus drivers are public employees within the meaning of PERA.

On April 12, 1972 the president of Local 1014 requested in writing the opening of negotiations on a new contract for the 1972–1973 school year. Van Buren did not respond to this demand. Several subsequent oral inquiries by the union president followed in May and June, 1972. A representative of Van Buren indicated in response that he was presently unable to arrange a satisfactory meeting date for Van Buren's negotiating team.

In early July, 1972 Van Buren advertised for bids on the operation of its school bus transportation system. National School Bus Service, Inc. submitted a bid, and on July 10, 1972 was awarded a subcontract at a meeting of the Van Buren School Board.

The following day, July 11, 1972, Van Buren notified its bus drivers by letter of the decision to subcontract the busing of its students. The letter suggested that the drivers contact National about "employment opportunities". Approximately 50% of Van Buren's 58 bus drivers were ultimately hired by National for the 1972–1973 school year.

On July 27, 1972 the union filed an action in Wayne County Circuit Court seeking injunctive and other relief for Van Buren's alleged failure to honor its contract with the union. On August 7,

[1] A 1965 amendment to PERA, 1965 PA 379, authorizes public employees to organize and engage in collective bargaining. MCLA 423.209; MSA 17.455(9).

1972 the union filed with the Michigan Employment Relations Commission (MERC) an unfair labor practice charge, alleging violations of § 10(a) and (e) of PERA.[2]

A hearing on the request for preliminary injunctive relief was held on August 18, 1972 and a preliminary injunction restraining Van Buren from terminating the employment of its bus drivers until a determination by MERC was granted by written order on August 25, 1972. Emergency leave to appeal was sought in this Court and denied on September 6, 1972.

On August 30, 1972 a hearing was held on the MERC complaint. On January 22, 1973 the administrative law judge issued a written opinion in which he found that Van Buren had engaged in an unfair labor practice in failing to bargain with the union about the decision to subcontract the busing of the students. Van Buren appealed to the full commission, which by written order dated October 1, 1973 adopted the decision of the administrative law judge in its entirety. The appeal in No. 18493 followed.[3]

In the meantime, the union on September 5, 1972 filed a petition for an order to show cause why Van Buren should not be held in contempt for violating the preliminary injunction. At a hearing on September 12, 1972, the circuit court declined to find Van Buren in contempt but instead reinstated its order and rescheduled the hearing on the petition for show cause. At a hearing held on October 4, 1972, Van Buren was found in contempt of the preliminary injunction. The appeal in Nos. 15473 and 15474 followed.

[2] MCLA 423.210(a), 423.210(e); MSA 17.455(10)(a), 17.455(10)(e).

[3] This appeal is by right. *Michigan Employment Relations Commission v Reeths-Puffer School District,* 391 Mich 253, 270 n 23; 215 NW2d 672 (1974).

I.

Van Buren first claims that the circuit court was without authority to enter its preliminary injunction because jurisdiction over unfair labor practice charges is by statute reserved to MERC.

Wisely, the union does not dispute the latter proposition. It is clear that MERC has been given exclusive jurisdiction over all unfair labor practices. MCLA 423.216; MSA 17.455(16), *Labor Mediation Board v Jackson County Road Commissioners,* 365 Mich 645; 114 NW2d 183 (1962), *Detroit Board of Education v Detroit Federation of Teachers,* 55 Mich App 499; 223 NW2d 23 (1974).

However, the circuit court has not here sought to exercise jurisdiction over the merits of the unfair labor practice charge. The circuit court did not purport to adjudicate the questions before MERC or oust MERC from jurisdiction to decide them.[4] The preliminary injunction was sought in aid of MERC's jurisdiction, not in opposition to it. Indeed, the language of the court's order makes this purpose plain:

> "It is ordered that the defendant, the Van Buren Public School District, its agents, employees and servants be and it hereby is restrained from termination of the employment of the drivers of the school district transportation department, *until hearing of this matter after final determination of case No. C-72-H137 of the Michigan Employment Relations Commission which is set for hearing on August 30, 1972 and based upon the same transaction as is this lawsuit,* or until further order of this court." (Emphasis supplied.)

[4] Thus we are not here faced with a situation where an administrative agency and a court are simultaneously requested to adjudicate the merits of the same dispute, calling for the application of the doctrine of primary jurisdiction. *See Smigel v Southgate School District,* 388 Mich 531, 552–562; 202 NW2d 305 (1972).

We are aware of no authority which would strip an equity court of the power to issue a preliminary injunction under these circumstances. Our circuit courts possess the traditional power of equity courts, MCLA 600.601; MSA 27A.601, and are regularly requested to grant injunctive relief. Indeed, it is not unusual for circuit courts to grant preliminary injunctions in labor disputes. See *Niedzialek v Barbers Union,* 331 Mich 296; 49 NW2d 273 (1951).

Van Buren seems to argue that MCLA 423.216; MSA 17.455(16) creates an exclusive method for obtaining injunctive relief in cases involving public employees. That section sets forth in great detail the procedure to be followed once an unfair labor practice charge has been filed. In particular, MCLA 423.216(h); MSA 17.455(16)(h) provides, in pertinent part:

"The board shall have power * * * to petition [a] circuit court * * * for appropriate temporary relief or restraining order, in accordance with the general court rules, and the court shall have jurisdiction to grant to the board such temporary relief or restraining order as it deems just and proper."

This section must be read only as a grant of authority to MERC to request judicial assistance and not as an implicit denial of the historic right of aggrieved private individuals to obtain such relief. We are confident that the Legislature here intended to create another technique for harnessing the powers of equity courts, to empower MERC to seek and obtain equitable relief. Absent such an enabling statute, MERC would be unable to protect its interest in the outcome of a dispute, once that interest is triggered by the filing of a charge, if the charging party decided that the protection of

a preliminary injunction was unnecessary or undesirable because MERC would have no authority to request equitable relief. The section merely allows MERC, as a party to a dispute, to protect its legitimate interests in a court of equity. In this way, the statute supplements traditional equity jurisprudence. We hold that neither PERA[5] nor case law deprives the circuit court of jurisdiction to issue a preliminary injunction in this case.

Van Buren contends, in the alternative, that even if the circuit court had jurisdiction to issue the preliminary injunction, it abused its discretion in doing so, because two of the prerequisites for obtaining a preliminary injunction—namely, irreparable injury and inadequate legal remedy—were insufficiently demonstrated by the union.

We accept the proposition that an injunction cannot be granted unless the party requesting it satisfies the court that he will otherwise suffer irreparable injury, *Royal Oak School District v State Tenure Commission,* 367 Mich 689, 693; 117 NW2d 181 (1962), and that he does not have an adequate remedy at law, *Schantz v Ruehs,* 348 Mich 680, 683; 83 NW2d 587 (1957). However, the union met this burden in the instant case.

The union members were threatened with irreparable harm. Had Van Buren been free to go forward unrestrained with its decision to terminate the employment of the bus drivers, the question before MERC—was there a duty to bargain about the subcontracting decision?—would have become moot for all practical purposes. In that

---

[5] *Cf. Holland School District v Holland Education Association,* 380 Mich 314, 325; 157 NW2d 206 (1968) [section 6 of PERA is not an exclusive remedy provision], *Detroit Board of Education v Detroit Federation of Teachers,* 55 Mich App 499, 505; 223 NW2d 23 (1974) [MERC does not have exclusive jurisdiction to enjoin strikes by public employees].

event, as the circuit judge so aptly put it, there would no longer be anything to bargain about. Absent equitable relief, a decision by MERC requiring bargaining on that issue would have been effectively nullified. The union's corresponding right to bargain about that issue would have been irreparably damaged. No back pay award or reinstatement order could restore the status quo, because the passage of time would—absent the interference of a court of equity—make the decision to subcontract irrevocable. The injunction was designed to prevent the irreparable injury resulting from Van Buren's making its bargaining position on the question of subcontracting unassailable and putting into action the very decision the union claimed was a subject for bargaining. This is precisely the kind of case where protection of the status quo, through issuance of a preliminary injunction, is particularly important.

In the same way, the union's legal remedy—resort to MERC's decisional process—was inadequate. While it is true that MERC is empowered to order reinstatement and back pay, MCLA 423.216(b); MSA 17.455(16)(b), a remedy which mirrors that ordered by the court in its preliminary injunction, the MERC remedy is not *"as* adequate, complete and certain as the relief in equity"*, Steggles v National Discount Corp,* 326 Mich 44, 49; 39 NW2d 237 (1949) (emphasis supplied), because the MERC remedy was not *immediately available,* [6] a primary consideration in passing on the adequacy of any legal remedy. *Schantz, supra,* at 683.

In order to be certain that a MERC decision would not be rendered nugatory by the mere

---

[6] The time lag occurring here—13 months from the charge filing date to the date of MERC's decision—makes the point.

passage of time, the court was asked to insure that there would be something to bargain about, in the event MERC decided there was a duty to bargain. The court was concerned with preventing the overwhelming impact of a *fait accompli.* In order to make certain there would be something to bargain about, Van Buren had to be enjoined from shifting completely and irrevocably to its new transportation system. Time was of the essence in a way that MERC's remedial system was not designed to appreciate. Only a court of equity could provide an adequate remedy. We conclude that both the threat of irreparable injury and lack of an adequate legal remedy were adequately demonstrated in support of the request for a preliminary injunction.

Van Buren also attacks the court's decision to grant the preliminary injunction and the subsequent finding of contempt with the following argument:

1. The court ordered Van Buren to not terminate the employees on or after August 25, 1972.

2. If the employees were terminated, they were either terminated before or after that date.

3. If they were not terminated after that date, the injunction was not violated.

4. If they were terminated before that date, the injunction was either not violated or it, in effect, ordered Van Buren to rehire the employees and was accordingly void as a mandatory injunction.

Van Buren contends that its letter of July 11, 1972, informing the bus drivers of its decision to award a subcontract to National, terminated the drivers' employment. Since this occurred prior to the effective date of the injunction which prohibited the termination of the drivers, Van Buren maintains that it cannot be said to have violated

the injunction, since it cannot be held in contempt for performing an act before it was told not to perform that act.

The short answer to this argument is that it misapprehends the message of the injunction. The circuit court acted to preserve what it conceived to be the status quo at the time of the August 18, 1972 hearing on the union's request for an injunction. It is evident from the record that the circuit judge believed that the bus drivers were still employed by Van Buren as of that date. He was not informed to the contrary by counsel for Van Buren until *after* the injunction was issued. In addition, the collective bargaining agreement was still in force at the time the injunction was issued, which further led the court to believe that the bus drivers were still employed by Van Buren on August 25, 1972. As the circuit judge explained at the October 4, 1972 contempt hearing:

"I think from a reading of the order that I entered and a reading of the transcript, it is clear that the intent of the order and the reasonable language of the order required that these drivers not be terminated from their employment but rather they be continued on as employee drivers of the school district transportation department until a resolution before the Michigan Employment Relations Commission and a return of this matter to the court."

The message of the order, as understood by all parties, was that the union drivers were to continue driving buses. We cannot accept Van Buren's offer to exalt form over substance. Nor can one party be allowed to unilaterally change the status quo sought to be protected or manipulate the corrective hand of a court of equity. The rule to be applied in a case like the one before us was set

forth in *Steggles, supra,* at 51, quoting from *Fredericks v Huber,* 180 Pa 572; 37 A 90 (1897):

" 'Equity regards the substance rather than the form of things, and will not allow itself to be baffled by a wrongful change while its aid is being invoked. The modern cases, therefore, have established the rule that the *status quo* which will be preserved by preliminary injunction is the last actual, peaceable, noncontested status which preceded the pending controversy, and equity will not permit a wrongdoer to shelter himself behind a suddenly or secretly changed status, though he succeeded in making the change before the chancellor's hand actually reached him. The doctrine is not new—only its application in practice to meet the efforts of those who endeavor to be swifter than justice and the law.' "

Even if Van Buren's claim that it had already fired the drivers, sold its buses, and "liquidated its busing business" is accepted, the injunction—which would then require Van Buren at least to rehire the drivers and make certain that they were employed in the transportation of Van Buren students—was still proper. Court orders which require mandatory affirmative action, necessary to the preservation of the status quo, have consistently been allowed in this state. *Gates v Detroit & M R Co,* 151 Mich 548; 115 NW 420 (1908), *Steggles, supra, L & L Concession Co v Goldhar-Zimner Theatre Enterprises, Inc,* 332 Mich 382; 51 NW2d 918 (1952). The following quotation from *Gates, supra,* at 551, is appropriate here:

"Courts look with disfavor upon mandatory injunctions and will only grant them when it is necessary to preserve the status quo. Usually an order restraining action will accomplish this result, but the status quo is not always 'a condition of rest, but of action'. Whenever courts have found a mandatory injunction essential to

the preservation of the status quo, and serious inconvenience and loss would result if not preserved, they have not hesitated to grant it." [Citations omitted.]

The trial judge sitting in equity thus has a great deal of leeway in choosing which status quo to protect:

"the maintenance of actual status quo is not the only function of an injunction *pendente lite.* The court can consider whether under all the facts and circumstances of the case the issuance of the temporary injunction will maintain the parties in that status which is least likely to do irreparable injury to the party who ultimately prevails." *Holland School District v Holland Education Association,* 380 Mich 314, 331; 157 NW2d 206 (1968) (Brennan, J., dissenting).

The costs to the union in not providing injunctive relief were, as we have seen, considerable. Any loss to Van Buren occasioned by the issuance of the preliminary injunction was in large part due to its imprudent actions and exacerbated by its contemptuous conduct. Accordingly, we conclude that the preliminary injunction could lawfully require Van Buren to take affirmative steps to insure the continued employment of the union drivers. We conclude further that Van Buren's failure to comply with the terms of the preliminary injunction constituted a clear violation of the court order and amply supported a finding of contempt.

Van Buren's final attack on the injunction is directed at the language of the order. It is said that the circuit judge did not draft the order in accordance with GCR 1963, 718.9(2) and (3), which provide, respectively, that every order granting an injunction must be "specific in terms" and must "describe in reasonable detail * * * the act or acts

sought to be restrained". Van Buren claims that it did not know what it was required to do to comply with the order.

The order has already been reproduced in this opinion. It clearly and unmistakably instructed Van Buren to insure that the union members were employed as bus drivers. Its terms were sufficiently specific and detailed to inform Van Buren of this.

Moreover, on September 12, 1972, when the parties appeared for the hearing on the show cause petition, the trial judge was careful to make absolutely certain that everyone understood what was required:

*"The Court:* I think the order is clear. I think it means that these drivers must be employed by the school district or must be employed, if not by the school district, by National Bus, as bus drivers until this matter is resolved by the MERC and the matter comes back here.

\* \* \*

"I want the matter worked out so I mean what I say in the injunction.

\* \* \*

"Do you gentlemen have anything you want to say?

*"Mr. McDonald:* No.

*"Mr. Townsend:* No, sir.

*"The Court:* Is it clear? Have I made myself clear so there is no question about it?

*"Mr. Townsend:* Yes, sir.

*"The Court:* All right."

Van Buren cannot at this late date be heard to complain that it was unaware of what was required of it. GCR 1963, 718.9 was fully satisfied by the preliminary injunction issued in this case.

In conclusion, we affirm the circuit court's deci-

sion to issue a preliminary injunction, we uphold its power to do so, we find the terms of the injunction issued to be in full compliance with GCR 1963, 718.9, and we hold that the finding that Van Buren was in contempt of that order is amply supported by the record. We affirm the trial judge's decision in Nos. 15473 and 15474 *in toto.*

II.

In No. 18493 Van Buren appeals from MERC's determination that it engaged in an unfair labor practice in violation of § 10 of PERA by failing to bargain with the union about the decision to subcontract the busing of students. In addition, Van Buren urges that the remedy ordered by MERC is excessive, punitive, and unjustified.

Under § 15 of PERA[7] a public employer is required to bargain collectively with duly elected representatives of its public employees. Certain issues in the collective bargaining process are by statute deemed so important to the resolution of labor disputes that they are considered mandatory subjects of bargaining.[8] Those subjects requiring mandatory bargaining are defined in § 15:

"A public employer shall bargain collectively * * * with respect to wages, hours, and other terms and conditions of employment".

The decisive question, then, is whether the subject upon which the employer refused to bargain—subcontracting of school bus driving previously performed by members of the bargaining unit—is

---

[7] MCLA 423.215; MSA 17.455(15).

[8] *See Detroit Police Officers Association v Detroit,* 391 Mich 44; 214 NW2d 803 (1974), for an excellent discussion of this labor law concept as it relates to PERA.

covered by the phrase "terms and conditions of employment" within the meaning of § 15 of PERA.

In interpreting this phrase, we may look for guidance to Federal case law construing § 8(d) of the National Labor Relations Act (NLRA), since the language of the two sections is identical and the Michigan Legislature apparently sought to pattern § 15 of PERA after § 8(d) of the NLRA. *Detroit Police Officers Association v Detroit,* 391 Mich 44, 53; 214 NW2d 803 (1974), *Michigan Employment Relations Commission v Reeths-Puffer School District,* 391 Mich 253, 260; 215 NW2d 672 (1974). This Federal case law has been termed "persuasive precedent" by our Supreme Court. *Detroit Police Officers Association, supra,* at 64.

We agree with the litigants and MERC that the United States Supreme Court decision in *Fibreboard Paper Products Corp v National Labor Relations Board,* 379 US 203; 85 S Ct 398; 13 L Ed 2d 233 (1964), is the place to begin. Both parties rely on it. MERC rested its decision on it, maintaining that "[t]here are striking similarities between *Fibreboard* and this case".

In *Fibreboard,* the employer decided to subcontract the maintenance work performed at one of its plants, work which previously had been done by union members. This decision was based on a study which disclosed that by engaging an independent contractor to do the maintenance work a substantial cost savings could be effected. A contract was entered into between the employer and an independent contractor, under which the employer would furnish necessary tools, supplies and equipment and the independent contractor would supply labor and supervision. The cost of this arrangement to the employer was substantially less than that borne by it under the previous union contract.

The Supreme Court held that the decision to subcontract the maintenance work concerned the "terms and conditions of employment" and was therefore a subject of mandatory collective bargaining. Several reasons were cited in support of this conclusion. Each of these reasons has appropriate application to the instant case, and the comparison of *Fibreboard* and this case convinces us that a similar conclusion is warranted regarding the subcontracting decision involved here.

First, the *Fibreboard* Court reasoned that "[t]he subject matter of the present dispute is well within the literal meaning of the phrase 'terms and conditions of employment' ". *Fibreboard, supra,* at 210. It was felt that the termination of the union members' employment necessarily resulting from the subcontracting decision was a very important "term and condition of employment". We think that the subject matter of the instant dispute, which also involves job termination, fits within the literal meaning of § 15 of PERA.

The second justification for the *Fibreboard* decision was that it effectuated one of the primary purposes of the NLRA, "to promote the peaceful settlement of industrial disputes by subjecting labor-management controversies to the mediatory influence of negotiation". *Fibreboard, supra,* at 211. The Court indicated that forcing the parties to bargain about the decision to subcontract would promote this purpose "by bringing a problem of vital concern to labor and management within the framework established by Congress as most conducive to industrial peace". *Fibreboard, supra,* at 211.

The Michigan act shares this fundamental pur-

pose[9] and we conclude that this purpose would be served by requiring the parties to bargain about the decision to subcontract the busing of pupils. Van Buren insists that its decision to subcontract could not possibly have been affected by anything the union could offer, short of assuming the total burden of the busing of pupils as National did. Van Buren points to the fact that it rejected economic concerns in reaching its decision, since it was forced to pay 15% more under the contract with National. Rather than cost-savings, Van Buren was to receive superior transportation services managed by transportation specialists and was relieved of the responsibilities of operating a transportation system. In sum, Van Buren argues that the factors motivating it were not suitable for resolution at the bargaining table.

We are not convinced that bargaining would have served no purpose. The merits of Van Buren's decision to subcontract are not so clear as to eliminate the need for discussion. Union input might reveal aspects of the problem previously ignored or inadequately studied by Van Buren. The union may well be able to offer an alternative to the one chosen by Van Buren which would fairly protect the interests and meet the objectives of both. Surely discussion of the subject would have done much to "promote industrial peace" and may even have prevented the present lawsuits. Negotiation, even if ultimately unsuccessful, does much to appease; explanation at the bargaining table will sooner quell anger than receipt of a tersely worded termination slip. The *Fibreboard* Court responded to a similar argument by saying:

"The short answer is that, although it is not possible

---

[9] *See, e.g.,* the description of the act's purposes in its title, "to provide for the mediation of grievances".

to say whether a satisfactory solution could be reached, national labor policy is founded upon the congressional determination that the chances are good enough to warrant subjecting such issues to the process of collective negotiation." *Fibreboard, supra,* at 214.

The final reason assigned by the *Fibreboard* Court in support of its decision was the fact that subcontracting "in one form or another has been brought, widely and successfully, within the collective bargaining framework". *Fibreboard, supra,* at 211. The Court looked to industrial practices to determine whether such decisions were thought by labor and management alike to lend themselves to collective bargaining. We accept the Court's conclusion on this matter; we are confident that industrial practices since 1964 have remained fairly constant. Any changes have no doubt been in the direction of increasing the scope of contractually required bargaining subjects and widening the variety of grievance filings.

Finally, § 15 of PERA must be even more expansively construed than its NLRA counterpart. Only by requiring mandatory bargaining on a wide range of subjects are public employees' rights protected, since pursuant to § 2[10] public employees are forbidden to strike.[11]

Van Buren argues that *Fibreboard* is distinguishable from the instant case. It contends that we have an obligation to limit *Fibreboard* to its facts, pursuant to Supreme Court request. *Fibreboard, supra,* at 215. Van Buren disputes the claim that the type of contracting involved in *Fibreboard* is similar to that involved here. It is said that

[10] MCLA 423.202; MSA 17.455(2).

[11] *See Davison Board of Education,* 8 MERC Lab Op 824, 827 (1973), *Westwood Community Schools,* 7 MERC Lab Op 313, 321 (1972).

subcontracting, according to *Fibreboard,*[12] is a mandatory subject of bargaining *only* if: 1) the decision to subcontract does not alter the employer's basic operation, 2) there is no capital investment or recoupment, 3) the employer's freedom to manage his business would not be significantly abridged by requiring bargaining. We agree that these factors are crucial in determining whether a given subcontracting decision is a subject of mandatory bargaining. However, we find that the facts of this case are substantially similar to those in *Fibreboard* and thus that Van Buren has a duty to bargain about its subcontracting decision.

In *Fibreboard* the employer's basic operation did not change under the subcontract because "maintenance work still had to be performed in the plant". *Fibreboard, supra,* at 213. Similarly, busing of students is still being carried out in the Van Buren School District. Van Buren remains responsible, even with National operating the transportation system, for the busing of the students in several important ways.

Once Van Buren decided to go into the busing "business" it could not liquidate that business merely by entering into a contract with National. Under state law, once the decision is made to bus any students, a school district must provide transportation for all resident pupils. MCLA 340.590a; MSA 15.3590(1). Any such school district must determine "regular routes" for transportation, follow the rules and regulations on school bus transportation promulgated by the superintendent of public instruction[13] and provide adequate buses of

---

[12] *Fibreboard, supra,* at 213.

[13] The superintendent of public instruction is granted the authority to regulate school bus transportation, MCLA 388.1010(c); MSA 15.1023(10)(c), in particular the routes, number of vehicles, and equipment. MCLA 340.600; MSA 15.3600.

ample capacity. MCLA 340.592; MSA 15.3592. School districts providing transportation must see to it that the buses used to transport students are painted properly, MCLA 340.595; MSA 15.3595, are equipped with suitable fire extinguishers, MCLA 340.598; MSA 15.3598, and comply with applicable school bus safety specifications. MCLA 340.594 b–e; MSA 15.3594(2)–(5).

Assuming the authority of the Van Buren School Board to enter into the subcontract with National,[14] Van Buren cannot thereby abandon the responsibilities imposed upon it by statute.[15] Van Buren remains in the busing business at least until it decides to cease providing transportation to all of its students.[16] Until then, its "basic operation" remains unchanged.

The employer in *Fibreboard* also satisfied the second test, because it merely replaced existing employees with those of the independent contractor to do the same work under similar conditions and did not recoup any capital investment. Van Buren maintains that it completely liquidated its busing business. It claims that it recovered its investment in school buses by selling them. Moreover, Van Buren continues, union employees were not merely replaced, but a highly professional organization was hired to more efficiently manage a highly sophisticated transportation system.[17]

[14] The validity of that contract is not before us. We note that the Legislature has explicitly granted school districts the authority to contract out the busing of *non-resident* pupils only. MCLA 340.591; MSA 15.3591.

[15] The decision to bus pupils is not without off-setting benefits. Qualified school districts receive compensation from the state for the cost of transportation. MCLA 388.621; MSA 15.1919(61).

[16] We do not decide whether a decision to go out of the busing business entirely would be a mandatory subject of bargaining.

[17] We accept the following findings of the administrative law judge: Van Buren was to receive under the contract with National 1) a new maintenance facility providing computerized, controlled maintenance

These facts are said to distinguish *Fibreboard* from the instant case.

We are not convinced. Van Buren apparently[18] agreed to sell almost all of its buses to National under an arrangement which allowed Van Buren to reduce its periodic payments to National by a corresponding amount. It could just as easily have termed the arrangement a conditional lease; "the most significant difference between this case and *Fibreboard* is probably the choice of forms made by the draftsmen who prepared the documents". *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, UAW v National Labor Relations Board,* 152 US App DC 274, 280; 470 F2d 422, 428 (1972), (Bazelon, C. J., dissenting). At the time of the MERC hearing, Van Buren had not recouped anything on its capital investment.

Nor do we think the features that National was to add to the transportation system of the Van Buren school district require us to depart from the *Fibreboard* principle. In *Fibreboard* itself the independent contractor promised to reduce the work force, decrease fringe benefits, eliminate overtime payments, preplan and schedule the services to perform, and provide supervision and office help. *Fibreboard, supra,* at 206. Of primary importance was that the work to be done by those replacing the union employees was essentially similar. In the instant case, the bus drivers employed by National are still driving buses, work which the union bus drivers are "capable of continuing to perform". *Fibreboard, supra,* at 210.

---

and gas storage, 2) two-way radios and "other sophisticated equipment", 3) a recruiting and training program for drivers, and 4) a full-time safety director to insure compliance with federal safety standards.

[18] The contract has not been made a part of the appellate record.

The final factor to be considered in determining whether a subcontracting decision is a subject of mandatory bargaining is whether the employer's right to manage his business would be unduly restricted if bargaining were required. The *Fibreboard* employer was found not to be restricted in the management of his business because, as Justice Stewart put it in a concurrence, the decision did not "lie at the core of entrepreneurial control". *Fibreboard, supra,* at 223.

Here Van Buren remains free, indeed obligated by state law, to manage its transportation system. Imposition of a duty to bargain "does not compel either party to agree on the proposal or require the making of a concession". *Detroit Police Officers Association, supra,* at 56. Van Buren will not be hampered in the management of its "business" or coerced into reversing what may be by now—thanks to its own failure to honor the circuit court injunction—a 2-1/2 year arrangement with National.

Van Buren has cited numerous post-*Fibreboard* cases which it claims more closely parallel the instant one.[19] The union has responded with its own line of cases which it insists have remained true to the principles laid down in *Fibreboard.* [20]

[19] *See, e.g., Jays Foods, Inc, v National Labor Relations Board,* 292 F2d 317 (CA 7, 1961), *National Labor Relations Board v Adams Dairy, Inc,* 350 F2d 108 (CA 8, 1965), *National Labor Relations Board v Thompson Transport Co,* 406 F2d 698 (CA 10, 1969), *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America, UAW, v National Labor Relations Board,* 152 US App DC 274; 470 F2d 422 (1972), *National Labor Relations Board v Royal Plating & Polishing Co,* 350 F2d 191 (CA 3, 1965), *National Labor Relations Board v Dixie Ohio Express Co,* 409 F2d 10 (CA 6, 1969).

[20] *See, e.g., National Labor Relations Board v Jackson Farmers, Inc,* 457 F2d 516 (CA 10, 1972), *National Labor Relations Board v C H Sprague & Son Co,* 428 F2d 938 (CA 1, 1970), *National Labor Relations Board v American Manufacturing Co of Texas,* 351 F2d 74 (CA 5, 1965), *National Labor Relations Board v Winn-Dixie Stores, Inc,*

We have carefully examined all of them. We are convinced, for the reasons previously stated, that MERC was correct in deciding that *Fibreboard* requires a finding that Van Buren engaged in an unfair labor practice in failing to bargain with the union about the decision to subcontract the busing of its students.[21]

## III.

MERC ordered Van Buren to comprehensively remedy the effects of its unfair labor practice by, among other things, 1) rescinding its subcontract with National and "reinstat[ing] such services as they existed prior to such unlawful subcontracting", 2) offering reinstatement and providing back pay to all former employees, and 3) bargaining upon request with the union "with regard to subcontracting of bargaining unit work". Van Buren insists that this order is punitive, inappropriate to effectuate the policies of PERA, and unfair. We disagree.

We are not unmindful that any affirmative action "including reinstatement of employees with or without back pay" ordered by MERC must "effectuate the policies of [PERA]". MCLA 423.216(b); MSA 17.455(16)(b). However, we are also reminded that MERC's power here, like that of the NLRB, is "a broad discretionary one, subject to limited judi-

---

361 F2d 512 (CA 5, 1966), *National Labor Relations Board v Northwestern Publishing Co,* 343 F2d 521 (CA 7, 1965), *National Labor Relations Board v Johnson,* 368 F2d 549 (CA 9, 1966), *Weltronic Co v National Labor Relations Board,* 419 F2d 1120 (CA 6, 1969).

[21] Van Buren also challenges MERC's finding that the union made a timely demand to bargain. That finding of fact is supported by competent, material and substantial evidence on the record and must be affirmed. *Regents of the University of Michigan v Employment Relations Commission,* 389 Mich 96, 113; 204 NW2d 218 (1973), *Michigan Employment Relations Commission v Detroit Symphony Orchestra,* 393 Mich 116, 121; 223 NW2d 283 (1974).

cial review. *National Labor Relations Board v Seven-Up Bottling Co,* 344 US 344, 346; 73 S Ct 287; 97 L Ed 377 (1953)". *Fibreboard, supra,* at 216.

Our review of this remedial order is governed by MCLA 423.216(e); MSA 17.455(16)(e), as follows:

> "[T]he court * * * shall grant to the board such temporary relief or restraining order as it deems just and proper, enforcing, modifying, enforcing as so modified, or setting aside in whole or in part the order of the board. The findings of the board with respect to questions of fact if supported by competent, material and substantial evidence on the record considered as a whole shall be conclusive."

We agree with the litigants that this standard of review requires that MERC's order not be disturbed " 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the act'. *Virginia Electric & Power Co v Labor Board,* 319 US 533, 540; 63 S Ct 1214; 87 L Ed 1568 [1943]." *Fibreboard, supra,* at 216.

The *status quo ante* remedy imposed here is designed to return the parties to the bargaining positions they were in before the unfair labor practices were engaged in, in full recognition of the fact that in order to make the duty to bargain meaningful there must be something to bargain about. This remedy was upheld in *Fibreboard* itself as "well designed to promote the policies of the [NLRA]". *Fibreboard, supra,* at 216. The administrative law judge convincingly explained his reasons for imposing this remedy:

> "I conclude that the *status quo ante* remedy must be recommended in this case, and that it is the only meaningful remedy under the circumstances herein.

Any lesser remedy would allow the employer to enjoy the fruits of its unlawful conduct, and the union would have no meaningful opportunity to have any input or leverage on the subcontracting decision or its effects on the bargaining unit employees. This is especially the case in public employment where employees are limited as to the economic sanctions that can be utilized to resolve disputes. Similar to the *Fibreboard* case, it is clear that the employer's bus operation is still being performed in much the same manner as it was prior to the subcontracting arrangement, and that the school district has a continuing need for such transportation services. Accordingly, I conclude the *status quo ante* remedy would impose no undue or unfair burden on the employer in this case."

Van Buren maintains that the *status quo ante* remedy is only appropriate where there is a finding of anti-union animosity. See, *e.g., National Labor Relations Board v Winn-Dixie Stores, Inc,* 361 F2d 512 (CA 5, 1966), *National Labor Relations Board v Northwestern Publishing Co,* 343 F2d 521 (CA 7, 1965). It suggests further that "[t]here is no finding in the instant case that petitioner had any anti-union animus or that any other unfair labor practice activity permeated its decision to cease operating its own bus service". Reply brief for appellant, at 16.

Assuming, *arguendo,* the validity of the claim that anti-union bias must be found before a *status quo ante* remedy is permissible, Van Buren conveniently overlooks MERC's explicit finding that it has *also* violated § 10(a) of PERA which makes it unlawful for a public employer "to interfere with, restrain or coerce public employees in the exercise of their rights guaranteed in section 9". MCLA 423.210(a); MSA 17.455(10)(a). Among the rights listed in § 9 is the right to bargain collectively. MCLA 423.209; MSA 17.455(9).

Section 10(a) of PERA adopts word-for-word the

analogous provision[22] of the NLRA. See *Michigan Employment Relations Commission v Reeths-Puffer School District, supra,* at 259. That section of the NLRA has repeatedly been used by the Federal courts as a basis for findings of anti-union animus. See, *e.g., Northwestern Publishing Co, supra.* We can therefore appropriately consider MERC's finding that Van Buren violated § 10(a) as indicative of a conclusion that sufficient anti-union animus was demonstrated to justify the remedy imposed.

In addition, the record contains "competent, material and substantial evidence", MCLA 423.216(e); MSA 17.455(16)(e), to support a finding of anti-union animus. Van Buren ignored repeated requests to bargain and refused to meet with union negotiators for four months, until legal proceedings were begun against it. Notice of the decision to subcontract was never sent to the union, even though that decision served to terminate the employment of union members and even though Van Buren was aware of the union's repeated attempts to begin negotiating a new contract. There was concededly no economic justification for the subcontracting decision, which was carried out despite a substantial increase in cost. Finally, National, though it hired nearly 50% of Van Buren's former employees, failed to hire any of the members of the negotiating team, even though these drivers had more job experience.

We are aware that the remedy imposed serves in large part to add additional support to the union's bargaining position, because it severs Van Buren's 2-1/2-year relationship with National and requires

---

[22] That provision is § 8(a)(1) of the NLRA, which provides:

"It shall be an unfair labor practice for an employer (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title".

Van Buren to actively reenter the busing business. However, any less drastic remedy would seriously disfavor the union and favor Van Buren by simultaneously weakening the union's bargaining position and strengthening Van Buren's, making bargaining on the subcontracting decision a useless gesture. In such circumstances, we find it equitable to favor that party which has done the least to create the dispute. As MERC stated in response to Van Buren's objections to the remedy:

"The employer had more than one opportunity to comply with the public employment relations act. It not only entered into a contract with the National School Bus Service, Inc., after having received a request from Local 1014 to bargain; it persisted in its action in face of a preliminary injunction issued by the Wayne County Circuit Court. The employer is in no position to object to the remedy."

Affirmed.