COUNCIL 25, LOCAL 893, AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO v MACOMB COUNTY ROAD COMMISSION

Docket No. 48323. Submitted June 24, 1980, at Detroit.—Decided October 23, 1980.

The Macomb County Road Commission employs several persons who are classified as drivers and who drive road commission vehicles during their employment. For several years the necessary criterion for driving county vehicles was that a driver maintain a "good driving record". This policy was continued in a safety policy adopted by the road commission and representatives of the employee union, Council 25, Local 893, American Federation of State, County and Municipal Employees, AFL-CIO. When the road commission attempted to obtain liability insurance for its employees the insurer insisted upon obtaining driving records of all employees who drove vehicles and subsequently notified the commission that five of those employees had unacceptable driving records and threatened cancellation unless corrective action were taken. The road commission sought clarification of the insurer's policy, and also discussed the problem with the union during contract negotiations. After approximately a year, during which time the commission insisted upon a written notice from the insurer, the insurer insisted upon a policy which would preclude from driving those employees who accumulated three moving violations in three years or one major violation in five years. The road commission announced its intention to implement the new rule and subsequently did so. The union then filed an unfair labor practice charge with the Michigan Employment Relations Commission, charging that the road commission had unilaterally changed

REFERENCES FOR POINTS IN HEADNOTES

[1, 2] 48A Am Jur 2d, Labor and Labor Relations §§ 1006, 1770.
   Bargainable or negotiable issues in state public employment labor relations. 84 ALR3d 242.
[3] 48 Am Jur 2d, Labor and Labor Relations § 1073.
[4] 48 Am Jur 2d, Labor and Labor Relations § 1027.
[5] 48A Am Jur 2d, Labor and Labor Relations § 1772.
[6] 48 Am Jur 2d, Labor and Labor Relations § 1500.

the terms and conditions of employment in violation of the public employment relations act. An administrative law judge dismissed the union's charges, and the dismissal was affirmed by the Employment Relations Commission. The union appeals, alleging that the Employment Relations Commission erred in ruling that the road commission had bargained in good faith regarding the driving requirements and that the road commission had bargained to the point of impasse, thereby justifying the unilateral change in terms and conditions of employment. *Held:*

1. The driving qualifications are a mandatory subject of bargaining, and the implementation of the new rule was a unilateral change in the working conditions.

2. The road commission utilized good faith efforts to resolve the issue of driving qualifications, as indicated by the year of discussions, grievance processing and contract negotiation on the issue.

3. During the year of negotiation the road commission attempted to avoid implementing the insurer's directive, and during that time the union never altered its position that the insurer could not impose any working condition on the parties nor did the union attempt to resolve the issue. The finding of the Employment Relations Commission, that the road commission had bargained to an impasse on the issue and, therefore, was justified in taking unilateral action, was not erroneous.

Affirmed.

1. LABOR RELATIONS — COLLECTIVE BARGAINING — MANDATORY SUBJECTS OF BARGAINING — PUBLIC EMPLOYMENT RELATIONS ACT.

Labor and management have a mutual duty to bargain in good faith with respect to wages, hours, and other terms and conditions of employment under the public employment relations act; subjects included within the phrase "wages, hours, and other terms and conditions of employment" are mandatory subjects of bargaining, and once a subject has been classified as mandatory the parties are required to bargain concerning the subject with neither party allowed to take unilateral action on the subject absent an impasse in negotiations (MCL 423.210, 423.215; MSA 17.455[10], 17.455[15]).

2. LABOR RELATIONS — COUNTY ROAD COMMISSIONS — CONDITIONS OF EMPLOYMENT — MANDATORY SUBJECTS OF BARGAINING.

Conditions under which a county road commission employee must maintain a satisfactory driving record in order to be classified

as an equipment operator and allowed to operate county vehicles are mandatory subjects of bargaining under a collective bargaining agreement between the employees and the road commission.

3. Labor Relations — Conditions of Employment — Unilateral Change — County Road Commissions.

A county road commission unilaterally changed the conditions of employment of its vehicle operators when it instituted a rule whereby no employee who had three moving violations in three years would be allowed to drive where the condition for driving had previously been the maintenance of a "good driving record".

4. Labor Relations — Collective Bargaining — Good Faith.

Parties in a collective bargaining setting have the obligation to meet and confer in good faith; the law does not require that the parties ultimately reach agreement nor does it dictate the substance of the terms on which the parties must bargain, rather, the requirement of good faith bargaining is simply that the parties manifest such an attitude and conduct that it will be conducive to reaching an agreement.

5. Labor Relations — Collective Bargaining — Impasse — Unilateral Action.

The parties to a collective bargaining agreement have reached an impasse where they are not able to agree on the terms of a mandatory subject of bargaining, at which time the employer may take unilateral action on the issue if that action is consistent with the terms of its final offer to the union.

6. Labor Relations — Appeal — Standard of Review — Statutes.

The standard of appellate review of a decision of the Employment Relations Commission is that the findings of the board with respect to questions of fact, if supported by competent, material and substantial evidence on the record considered as a whole, shall be conclusive (MCL 423.23[e], [f]; MSA 17.454[25][e], [f]).

*Zwerdling & Maurer* (by *George B. Washington*), for plaintiff.

*Peterson, Hay & Seay, P.C.,* for the Macomb County Road Commission.

Before: J. H. GILLIS, P.J., and V. J. BRENNAN and A. C. MILLER,* JJ.

V. J. BRENNAN, J. This cause is on appeal from the Michigan Employment Relations Commission (MERC). Appellant Council 25, Local 893, American Federation of State, County and Municipal Employees (Union) appeals from an order dismissing its unfair labor practice charge against appellee Macomb County Road Commission (Road Commission).

The Road Commission employs 150 highway maintenance workers represented by the Union. Seventy of these 150 employees are placed in a "driver" classification which requires them to drive commission trucks during their employment.

Since 1966, a "good driving record" has been the necessary criterion for driving county vehicles. On or about May 19, 1977, a committee of employer and Union representatives adopted a safety policy which reiterated the standing Road Commission policy pertaining to driving records. The pertinent portion of the safety policy reads as follows:

"An employee shall * * * maintain a responsible driving record both on and off the job and report immediately any suspension or permanent withdrawal of a valid driver's license or any violation points attached to said license. County vehicles will be operated in strict accord with all Road Commission policies and the laws of the State of Michigan."

Accordingly, over the past several years the status of an employee's driving record has been investigated every time there was a promotion.

Prior to 1978, the Road Commission dealt with two instances in which the employees had accumu-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

lated "bad driving records". In both cases, the Union and Road Commission negotiated an amicable solution to on-the-job driving problems caused by medical conditions. In one instance the Road Commission demoted an employee with no loss in pay and relieved him of his driving responsibilities following grievance negotiations with the Union. In the other, an employee was temporarily relieved from his driving responsibilities because of a medical problem which caused him to fall asleep while driving. The Union and the Road Commission mutually agreed that it was "best that he not drive for the safety of everybody concerned".[1]

Early in 1977, the Road Commission indicated that it was having difficulty in finding motor vehicle liability coverage for its employees. The Road Commission received only one bid for such coverage and at that the premium had quadrupled. Ultimately insurance coverage was obtained. The insurance company, however, asked the Road Commission to submit a list of the names and driver's license numbers of all employees who drove licensed vehicles. The Union refused to divulge this information to the Road Commission. The insurance company ultimately carried out its own investigation of all employees with driver status and obtained the necessary information regarding driving records.

In June of 1977, the Road Commission was notified by its insurance agent, Blanchard Agency, that because certain individuals had unacceptable driving records corrective measures would have to be taken or the Road Commission would face cancellation of insurance coverage. The Road Commission immediately took objection to this verbal

---

[1] Eventually this employee was reinstated to his former driving status when his medical problems were cured.

warning and began corresponding with the insurance agent as to how to deal with this new problem. In addition to requiring written notification of the method by which an employee could obtain "acceptable records, whereby the restriction would be lifted", the Road Commission objected to the insurance company's inclusion of one employee on its list as having an unacceptable record.

During the contract negotiations which occurred in the last half of 1977, the parties discussed the issue of driving restrictions. The Road Commission indicated that it had no alternative but to follow the insurance company's recommendations. The Road Commission also indicated that it was exploring alternatives and that it would do nothing further without written notice from the insurance company. No further action regarding the driving restrictions was taken at that time.

On May 31, 1978, the insurance carrier sent the Road Commission a formal written notice indicating that the driving records of five employees were deemed unacceptable.[2]

The Road Commission responded by letter on June 5, 1978, noting that the insurance company's actions affected the employees' conditions of employment and requesting clarification of the restrictions and the process of review.

On June 12, 1978, after several conversations with the Road Commission, the insurance agency

---

[2] The notice stated:

"We are enclosing motor vehicle records for several drivers of vehicles covered under the captioned fleet policy. We are advised by the insurance company that these records are unacceptable. They are asking that definite action be taken to eliminate the individuals as regular operators of vehicles.

"Obviously some time may be necessary for the persons involved to be scheduled in other duties if that is possible. We must advise, however, that the Hartford Insurance Group is unwilling to continue the fleet policy if action is not taken in regard to these records. Thank you for advising us when appropriate action has been taken."

enunciated a policy establishing criteria for removal of employees from driving positions and reinstatement of driving privileges. The announced policy was that no employee with three moving violations in three years or one "major" violation in five years would be permitted to drive; less than three minor violations in three years would subject the employee to reconsideration.

On June 15, 1978, the Road Commission convened a meeting with the Union representatives to discuss the correspondence from the insurance agent and the driving records of the employees. The Union states that the Road Commission notified it of its intention to comply with the notice from the insurance company. The Union's position at this meeting was that the insurance company had no right to affect the driving rights of employees who still possessed valid Michigan driver's licenses.

On June 19, 1978, the Road Commission notified the insurance company by letter that it intended to comply with the insurance company's position regarding driving privileges. On June 23, 1978, the Road Commission sent a memorandum regarding employee driving records to the acting president of the local union.[3] A board meeting was held on June 27, 1978, at which time the Road Commission discussed the directive from the insurance company regarding the driving records of its employees. A motion was then passed by the Commission-

---

[3] The June 23, 1978, letter stated:

"I have attached correspondence relative to driving records and the insurance carrier's position regarding these records. As I discussed at our meeting on June 15th, the employees affected are being restricted from driving and where such restrictions affect the employee's job classification where driving is not required. These restrictions and reclassifications will be subject to review in the future and lifted when the employee demonstrates improvement. It is important that the matter of vacated positions due to the demotions be discussed and I intend to bring the issue up at our next meeting."

ers prohibiting three employees from driving and demoting other employees, one of whom subsequently resigned.

On August 1, 1978, the Union filed an unfair labor practice charge with the Michigan Employment Relations Commission, charging that the employer had unilaterally changed the terms and conditions of employment in violation of § 10(1)(e) of the Michigan public employment relations act ("PERA"), MCL 423.210(1)(e); MSA 17.455(10)(1)(e).

On September 11, 1978, a hearing was conducted on the matter before Administrative Law Judge Kurtz. On May 17, 1978, Judge Kurtz dismissed the Union's charges. The Union objected to the administrative law judge's decision and to the following findings: (1) that the Road Commission had bargained in good faith; (2) that the Road Commission bargained to impasse; and (3) that the Road Commission did not change existing conditions of employment.

The Michigan Employment Relations Commission (MERC) affirmed the dismissal of the unfair labor practice charge in a 2-1 decision. The Union now appeals from this determination.

The Union brings two issues on appeal. The first is whether the administrative law judge and MERC properly held that the Road Commission bargained in good faith under § 10(1)(e) of the public employment relations act, (PERA) MCL 423.210; MSA 17.455(10).

We find that this question must be answered in the affirmative.

The duty to bargain under PERA is set forth in § 15:

"A public employer shall bargain collectively with

the representatives of its employees as defined in section 11 and is authorized to make and enter into collective bargaining agreements with such representatives. For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract, ordinance or resolution incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession." MCL 423.215; MSA 17.455(15).

The "good faith" requirement is patterned after § 8(d) of the National Labor Relations Act (NLRA), 29 USC 158(d). *Detroit Police Officers Ass'n v Detroit,* 391 Mich 44; 214 NW2d 803 (1974). Under both PERA and NLRA, the collective bargaining obligation is defined as the mutual duty of labor and management to bargain in good faith with respect to "wages, hours, and other terms and conditions of employment". The subjects included within this latter phrase are referred to as "mandatory subjects" of bargaining. Once a specific subject has been classified as a mandatory subject of bargaining, the parties are required to bargain concerning the subject, and neither party may take unilateral action on the subject absent an impasse in negotiations. *Fibreboard Paper Products Corp v National Labor Relations Board,* 379 US 203; 85 S Ct 398; 13 L Ed 2d 233 (1964).

Michigan has adopted a broad view of "other terms and conditions of employment". See *Van Buren Public School Dist v Wayne Circuit Judge,* 61 Mich App 6; 232 NW2d 278 (1975). In *Detroit Police Officers Ass'n, supra,* the Supreme Court set

forth the following examples of mandatory subjects of collective bargaining:

"[S]uch subjects as hourly rates of pay, overtime pay, shift differentials, holiday pay, pensions, no-strike clauses, profit sharing plans, rental of company houses, grievance procedures, sick leave, work-rules, seniority and promotion, compulsory retirement age, and management rights clauses, are examples of mandatory subjects of bargaining." *Detroit Police Officers Ass'n, supra,* 55.

Promotional standards and the criteria for those standards are mandatory subjects of collective bargaining, *Detroit Police Officers Ass'n v Detroit,* 61 Mich App 487; 233 NW2d 49 (1975). MERC has held that driving conditions similar to those at issue in the case at bar are mandatory subjects of bargaining. *City of Ecorse,* 1979 MERC Lab Op 370.

In view of the above and the fact that the characterization of the driving requirements as "mandatory subjects of bargaining" is not contested by the parties, the driving requirements imposed by the insurance company fall within the scope of § 15 of PERA.

A second premise of the MERC decision—that there was in fact an actual unilateral change in a working condition—must be reviewed prior to reaching the merits of the Union's claim that the parties had not reached an impasse in their negotiations before the change was imposed.

The Road Commission contends that "we have done nothing more than enforce an existing policy". The administrative law judge agreed. Judge Kurtz found that the Road Commission's reliance in 1978 upon the three violation-three year criterion to judge the qualifications of its drivers was

merely an extension of the "good driving record" requirement. Judge Kurtz stated:

"More important, however, is the * * * argument that the job descriptions of driving jobs require a 'good driving record', and that the safety policy of the Employer, which had been jointly drawn up with the Union, required an employee to, 'Maintain a responsible driving record both on and off the job * * *'. I agree with the Employer that the words 'good' and 'responsible' modifying 'driving record' mean something more than the mere possession of a Michigan drivers license. The modifying adjectives could only mean that something more than the possession of a drivers license was required of the employee, and the record establishes that on at least a few instances prior to June of 1977, the Employer did take action to implement its understanding of the modifying adjectives. The fact that the insurance company caused the pre-existing requirement of a good or reasonable driving record to be enforced more vigorously does not negate the existence of the requirement in the first instance."

However, MERC found that the three violation-three year rule implemented in 1978 was not a mere continuation of the general policy requiring a "good driving record":

"We agree with the Administrative Law Judge that the preexisting use of the words 'good' and 'responsible' modifying 'driving record' indicates that the Employer expected something more than possession of a driver's license. However, it was not clear to the employees or their representative that a three violation-three year rule would be implemented until (at the earliest) June of 1977. We find that the subsequent implementation of the three violation-three year rule amounted to a unilateral change in working conditions. The Administrative Law Judge's findings of fact must be amended to this extent."

We concur with MERC's finding that the Road Commission instituted a unilateral change in the conditions of employment. The testimony adduced at the hearing supports MERC's conclusion.

The contract between the parties contains no specific requirements with respect to driving qualifications. A job description was introduced into evidence which listed a "good driving record" to be a desirable qualification for "Equipment Operator A". The Union offered uncontradicted testimony to the effect that the only requirement in the past to hold a driving position was possession of a valid Michigan driver's license. A safety manual was formulated in 1966 by a joint committee consisting of both employees and employer representatives. The manual provided that "an employee shall * * * maintain a responsible driving record both on and off the job * * *". However, prior to the institution of the three violation-three year rule in 1978, only two employees were demoted or reassigned due to deficiencies in their driving records. In these two instances, the driving problems stemmed from medical causes. The three violation-three year rule constituted a much more stringent and specific condition of employment than had existed in the past. The fact that it was not a mere continuation of the prior "good driving record" policy is demonstrated by the immediate demotion of several employees when the new qualifications went into effect in 1978. Thus, we find that the Road Commission unilaterally changed the conditions of employment when it implemented the three violation-three year rule.

On appeal, the Union postures that the Road Commission did not exercise the requisite good faith bargaining so as to justify such a unilateral change.

In *Detroit Police Officers Ass'n v Detroit, supra,* 53-54, the Court explained the obligation of good faith bargaining:

"The primary obligation placed upon the parties in a collective bargaining setting is to meet and confer in good faith. The exact meaning of the duty to bargain in good faith has not been rigidly defined in the case law. Rather, the courts look to the overall conduct of a party to determine if it has actively engaged in the bargaining process with an open mind and a sincere desire to reach an agreement. *National Labor Relations Board v Montgomery Ward & Co,* 133 F2d 676, 686; 146 ALR 1045 (CA 9, 1943); *National Labor Relations Board v General Electric Co,* 418 F2d 736, 756 (CA 2, 1969); *cert den* 397 US 965 (1970); Morris, Ed, *The Developing Labor Law,* ch 11 (1971). The law does not mandate that the parties ultimately reach agreement, nor does it dictate the substance of the terms on which the parties must bargain. In essence the requirement of good faith bargaining is simply that the parties manifest such an attitude and conduct that it will be conducive to reaching an agreement. *Edwards, supra,* 894."

See also *Lamphere School Dist v Lamphere Federation of Teachers,* 67 Mich App 485, 488; 241 NW2d 257 (1976).

We concur with Judge Kurtz's[4] and MERC's[5] findings that the Road Commission utilized good

[4] Administrative Law Judge Kurtz held:

"There is no evidence that the Employer approached the problem in this case in bad faith or with an intent to avoid its bargaining obligation with the Union. On the contrary, the record substantiates a conclusion that the Employer exhausted every means at its disposal to change or delay the decision of the insurance company, and that these efforts were known to the Union and it apparently acquiesced in these efforts. Under these circumstances, I find no violation of the Employer's bargaining obligation in this matter."

[5] MERC upheld Judge Kurtz's findings involving good faith:

"We find as did the Administrative Law Judge that there was adequate opportunity to bargain about it; that the Employer made good faith efforts for one year to seek a resolution of its problem with the Union * * *."

faith efforts for over a year in attempting to resolve the problem of driving qualifications.

When originally notified by its insurance carrier that several driver-employees were unacceptable risks and that corrective measures would have to be taken, the Road Commission took objection to the method of notification and requested more details concerning the methods by which its employees could present acceptable records. The Road Commission also objected to the inclusion of one employee on the tentative list. When notice of the new requirements was given to the Union, a grievance was filed by the Union. The parties thereafter reached a temporary resolution by restoring the employees to driving status pending written notice of the insurance company's position. The issue of driving restrictions was subject to further negotiation and discussions. When the insurance company finally notified it that five employees were unacceptable, the Road Commission responded with a letter noting that the actions affected the conditions of employment and requesting further clarification. Further discussion with Union representatives occurred before the employees were finally demoted. In its June 19, 1978, letter to the Blanchard Agency, the Road Commission asked that an exception be made for one employee.

The above testimony supports the finding that "[r]ather than the Employer herein acting precipitously * * * the record substantiates a conclusion that the Road Commission went out of its way to avoid implementing the directive of its insurance carrier * * *". The year of discussion, grievance processing, and contract negotiation on the issue of driving qualifications is indicative of a good faith effort on the part of the Road Commission to bargain and resolve the problem. Having mani-

fested an attitude which was conducive to reaching an agreement, and faced with loss of insurance coverage, the alteration in driving qualifications was justified unilateral employer action.

The Union's reliance on *City of Ecorse, supra,* is misplaced. In *Ecorse,* the employer was found to have engaged in unfair labor practices by reason of its suspension of driving privileges of certain employees without notice and an opportunity for the Union to bargain on the issue. Unlike the present case, the employer instituted the unilateral change only ten days after notice from its insurance carrier. Moreover, the facts indicated that virtually no standards for driving previously existed nor was there a past practice of policing the driving habits of the employees. Furthermore, the charging party denied that it ever met with the employer to discuss the issue of driving standards. Thus, Commissioners Rehmus and Milmet, who heard the *Ecorse* case as well as the case at bar, distinguished the two cases by noting that in the instant case "there was adequate opportunity to bargain" and "that the Employer made good faith efforts for one year * * *".

Defendant's final contention is that MERC erred in its finding that the Road Commission had bargained to the point of impasse, thereby justifying its unilateral change in the conditions of employment.

The necessity of impasse as a prerequisite to unilateral changes in conditions of employment has been explained by the Court in *DPOA v Detroit, supra:*

"After the parties have met in good faith and bargained over the mandatory subjects placed upon the bargaining table, they have satisfied their statutory duty. *National Labor Relations Board v American Na-*

*tional Insurance Co,* 343 US 395, 404; 72 S Ct 824, 829; 96 L Ed 2d 1027 (1952). The express wording of § 15 PERA and § 8(d) NLRA make it clear that the obligation to bargain does not compel either party to agree to a proposal or require the making of a concession. 'Thus, * * * the obligation * * * is simply to bargain in good faith on the items mentioned in the statute [PERA].' *Regents of the University of Michigan v Labor Mediation Board,* 18 Mich App 485; 171 NW2d 477 (1969).

"If the parties are not able to agree on the terms of a mandatory subject they are said to have reached an 'impasse'. Under the NLRA when good faith bargaining has reached an impasse, the employer may take unilateral action on an issue if that action is consistent with the terms of its final offer to the union." *DPOA v Detroit, supra,* 55-56.

Initially the Union contends that the issue of impasse was not raised by the parties and was therefore outside the scope of administrative review.[6]

We disagree. Judge Kurtz found that "the Union had ample notice of the impending action of the Employer in regard to driving records, and an opportunity to bargain on such matter * * * I conclude the parties were at an impasse over the issue, and the Employer was justified in taking the action it did to implement the directive of the insurance company". And MERC held that "on or about June 15, 1978" an impasse occurred which "justified unilateral Employer action". MERC found as did Judge Kurtz "that there was adequate opportunity to bargain" and that "[t]he record is clear that during one full year of discus-

---

[6] The Union argues that the issue at impasse was neither pleaded as a defense nor otherwise litigated by the parties and that the MERC decision is thus in direct conflict with MCL 24.272(3); MSA 3.560(172)(3), which provides that "[t]he parties shall be given an opportunity to present oral and written arguments on issues of law and policy and an opportunity to present evidence and argument on issues of fact".

sion, grievance processing, memoranda writing, and specific contract negotiations on the subject at hand, the Union never advanced a counterproposal * * *". MERC concluded that "the Union by inaction cannot prevent an impasse from occurring". Thus, the issue of impasse was properly considered by the administrative law judge and MERC. The issue, inseparable from the unfair labor practice charge, was raised by the facts as stated by the parties. Thus, it was properly considered by Judge Kurtz and MERC.

MERC's determination of whether an impasse existed is subjected to only limited review by this Court. The standard of appellate review of MERC findings of fact is set forth in MCL 423.23(2)(e), (f); MSA 17.454(25)(2)(e), (f):

"The findings of the board with respect to questions of fact if supported by competent, material and substantial evidence on the record considered as a whole shall be conclusive."

See also Const 1963, art 6, § 28, *MERC v Detroit Symphony Orchestra, Inc,* 393 Mich 116, 121; 223 NW2d 283 (1974), *Lansing School Dist v MERC,* 94 Mich App 200, 204; 288 NW2d 399 (1979), *Ann Arbor Bank & Trust Co v Comm'r of the Financial Institutions Bureau,* 85 Mich App 131, 137-138; 270 NW2d 725 (1978), *Van Buren Public School Dist v Wayne Circuit Judge,* 61 Mich App 6; 232 NW2d 278 (1975).

Our review of the record supports MERC's finding that an impasse did in fact occur. The change in driving qualifications posed by the insurance company was known to both parties for approximately one year before it was finally implemented by the Road Commission. In mid-1977 the Road Commission was notified by the insurance com-

pany that several driver-employees were unacceptable risks due to their poor driving records. The Commission immediately took objection to the method of notification utilized by the insurance company and in turn notified its employees of the possible changes in driving requirements. The issue was the subject of discussion between the parties on several occasions during contract negotiations in the latter part of 1977. The Union's awareness of the problem is evidenced by the employees' concerted refusal to reveal their driver's license numbers when the Road Commission requested them to do so in order to enable the insurance company to make an investigation of driving records. The Union's adamant stance on the issue is demonstrated by the grievances which were filed as early as January of 1978. The grievances were temporarily resolved when the Union and the Road Commission agreed to restore certain driver-employees to driving status pending written notice of the insurance company's position. As of June, 1978, the parties were still in disagreement as to the propriety of the new three violation-three year rule. On June 15, 1978, the Road Commission held a meeting with Union representatives to again discuss the insurance company directive and the effect it would have on certain employees. The Union reiterated its protest that the insurance company had no right to affect the driving rights of employees who still possessed valid Michigan driver's licenses. At this point in time, the grievance alleging unfair labor practices was filed by the Union.

The above sequence of events clearly indicates that bargaining on the subject of driving performance had progressed to the point of impasse by June 15, 1978. During one full year of negotiation

and grievance processing, the Union never altered its position that the third-party insurance company could not impose any condition of work on the parties. As noted by MERC, "[t]he Union's intransigence, or inability to come up with a creative solution may well have precipitated the impasse. In any event, the Union by inaction cannot prevent an impasse from occurring". On the other hand, the Road Commission "went out of its way to avoid implementing the directive of its insurance carrier that employees with poor driving records should be prohibited from driving Road Commission vehicles". According to the above facts, the administrative law judge (and MERC) correctly concluded that:

"The meeting of the parties on June 15, 1978, confirmed the pre-existing positions of both parties, with the Employer taking the position that it could no longer delay taking action on the directive of the insurance company issued the previous June, and the Union steadfastly maintaining its position that the insurance company had no right to dictate whether the employees could drive a Road Commission vehicle. * * * the parties were at an impasse over the issue, and the Employer was justified in taking the action it did to implement the directive of the insurance company. *Grosse Pointe Fire Dep't,* 1977 MERC Lab Op 689, 695."

Affirmed.