IN THE MATTER OF LOCAL 195, IFPTE, AFL–CIO, APPELLANT, AND STATE OF NEW JERSEY, RESPONDENT.

IN THE MATTER OF STATE OF NEW JERSEY, APPELLANT AND CROSS-RESPONDENT, AND STATE SUPERVISORY EMPLOY-EES ASSOCIATION, A/W N. J. CIVIL SERVICE ASSOCIA-TION/N. J. STATE EMPLOYEES ASSOCIATION (PRIMARY LEVEL SUPERVISORS UNIT), RESPONDENT AND CROSS-AP-PELLANT.

IN THE MATTER OF STATE OF NEW JERSEY, APPELLANT AND CROSS-RESPONDENT, AND N. J. CIVIL SERVICE ASSOCIA-TION/N. J. STATE EMPLOYEES ASSOCIATION (ADMINIS-TRATIVE & CLERICAL SERVICES UNIT), RESPONDENT AND CROSS-APPELLANT.

IN THE MATTER OF STATE OF NEW JERSEY, APPELLANT AND CROSS-RESPONDENT, AND N. J. CIVIL SERVICE ASSOCIA-TION/N. J. STATE EMPLOYEES ASSOCIATION (PROFES-SIONAL UNIT), RESPONDENT AND CROSS-APPELLANT.

Argued November 2, 1981—Decided March 23, 1982.

*Erminie L. Conley,* Assistant Attorney General, argued the cause for respondent and appellant and cross-respondent State of New Jersey (*Judith A. Yaskin,* Acting Attorney General of New Jersey, attorney).

*Andrew F. Zazzali, Jr.* and *Dennis J. Alessi* submitted a brief on behalf of *amicus curiae* State AFL–CIO (*Zazzali & Kroll,* attorneys).

*Sanford R. Oxfeld* argued the cause for appellant Local 195 IFPTE, AFL–CIO (*Rothbard, Harris & Oxfeld,* attorneys).

*Richard H. Greenstein* argued the cause for respondent and cross-appellant State Supervisory Employees Association, etc., et al. (*Fox & Fox,* attorneys).

*Sidney H. Lehmann,* General Counsel, argued the cause for respondent Public Employment Relations Commission (*Sidney H. Lehmann,* attorney; *Sidney H. Lehmann* and *Don Horowitz,* Deputy General Counsel, on the briefs).

The opinion of the Court was delivered by

PASHMAN, J.

The New Jersey Employer-Employee Relations Act, *N.J.S.A.* 34:13A–1 to –21, provides for collective bargaining between the State of New Jersey and public employee unions. During contract negotiations between the State and Local 195 of the International Federation of Professional and Technical Engineers, AFL–CIO (Local 195)[1] and between the State and State Supervisory Employees Association (Association),[2] disputes arose over the negotiability of several provisions. Once again we must determine the scope of collective bargaining for public employees.

## I

## FACTS AND PROCEDURAL HISTORY

A. *In the Matter of Local 195*

From late 1978 to early 1979, the State and Local 195 were engaged in collective negotiations on a contract to run from July 1979 to June 1981. During the course of the negotiations, the negotiability of several contractual provisions came into question. The disputed clauses concerned (1) limitations on contracting and subcontracting, (2) the establishment of a workweek, and (3) transfer and reassignment determinations. Unable to reach agreement, the parties filed a joint petition for a scope of negotiations determination with the Public Employment Relations Commission (PERC) on May 31, 1979.[3] *N.J.S.A.* 34:13A–5.-4(d).

---

[1]Local 195 is the majority representative of the Inspection and Security Unit, the Operations, Maintenance and Services Unit, and the Crafts Unit of the State of New Jersey.

[2]The Association represents the Administrative and Clerical Services Unit, the Professional Unit, and the Primary Level Supervisory Unit.

[3]No specific dispute has arisen about the application of any of the provisions. Rather, the State sought to remove the disputed clauses from the

On January 4, 1980, PERC held that the disputed contracting/subcontracting and workweek provisions, and portions of the transfer and reassignment provisions, were mandatorily negotiable. *In re Local 195, IFPTE, AFL–CIO,* PERC No. 80–85, 6 *NJPER* 32 (1980). In deciding that subcontracting was a negotiable issue, PERC relied on its earlier cases,[4] arguing that subcontracting must be mandatorily subject to negotiation since

> a decision to subcontract would effectively terminate the employment relationship vis-a-vis the employees in a negotiations unit and would have a "cataclysmic effect on wages, hours, and working conditions...." [Slip op. at 6]

On October 6, 1980, the Appellate Division substantially affirmed PERC's determinations regarding the workweek and the transfer and reassignment provisions. 176 *N.J.Super.* 85 (1980).[5] The court divided on the negotiability of subcontracting. The majority reversed PERC and held that the determination to subcontract work is an inherent managerial prerogative. Judge Morgan dissented, arguing that the majority had failed to consider the interests of public employees in reaching its decision. Applying a balancing test, Judge Morgan would have found subcontracting to be a mandatorily negotiable issue.

Because of the dissent below, this case comes before the Court on appeal as of right. *R.* 2:2–1(a)(2).

---

agreements under negotiation. Thus, there is no present factual context against which to measure the effect of the clauses.

[4]*In re Township of Little Egg Harbor,* PERC No. 76–15, 2 *NJPER* 15 (1976); *In re Camden Bd. of Chosen Freeholders,* PERC No. 78–16, 3 *NJPER* 332 (1977), appeal dis., application for enforcement granted; *In re Middlesex County College Bd. of Trustees,* PERC No. 78–13, 4 *NJPER* 4023 (1977); *In re Rutgers, The State University,* PERC No. 79–72, 5 *NJPER* 185 (¶ 10103, 1979); *In re State of New Jersey,* PERC No. 80–19, 5 *NJPER* 381 (¶ 10194, 1979), appeal pending, App.Div. Docket No. A–463–79.

[5]The Supreme Court denied the State's petition for certification on these issues.

B. *In the Matter of State Supervisory Employees Association*

The State of New Jersey and the New Jersey State Supervisory Employees Association, New Jersey Civil Service Association and the New Jersey State Employees Association began negotiations in late 1978 for a contract to run from July 1979 to June 1981. During the negotiations, dispute arose over the negotiability of the same three topics at issue in *Local 195.*

The State filed three petitions for scope of negotiations determinations with PERC on May 25, 1979.[6] On August 28, 1979, PERC held that the subcontracting and workweek provisions were mandatorily negotiable. It further held some of the reassignment provisions negotiable because they reflected procedural concerns of the employees rather than substantive policy determinations by the employer. *In the Matter of State and State Supervisory Employees Association*, PERC No. 80–19, 5 *NJPER* 381 (1979). Those provisions that were substantive in nature were held to be non-negotiable.

Relying on the majority opinion in *Local 195, supra*, the Appellate Division again held subcontracting to be a non-negotiable subject. As in *Local 195*, Judge Morgan dissented on the issue of subcontracting. The Appellate Division also substantially affirmed PERC's determinations regarding the workweek and reassignment provisions. Unlike PERC, however, the Appellate Division held that provisions regarding (1) the applicability of seniority in transfer determinations, and (2) the transfer of Association officers and stewards, were non-negotiable subjects.

An appeal as of right was taken by the Association on the subcontracting provision, under *R.* 2:2–1(a)(2). In addition, the Supreme Court granted certification on the transfer and reassignment provisions, upon petition by the Association, and on the workweek provision, upon petition by the State.

---

[6]The three petitions were consolidated by PERC on August 9, 1979.

## II

## SCOPE OF NEGOTIABILITY

▉ Public employees in New Jersey have a constitutional right to organize and present "grievances and proposals" to public employers through representatives of their own choosing. *N.J.Const.* (1947), Art. I, par. 19. The parameters of collective negotiations about such proposals were established in 1968 by the New Jersey Employer-Employee Relations Act, *N.J.S.A.* 34:13A–1 to –21, and later by judicial decisions.

The central issue in a scope of negotiations determination, is whether or not a particular subject matter is negotiable. This depends on careful consideration of the legitimate interests of the public employer and the public employees. The process of balancing those competing interests is constrained by the policy goals underlying relevant statutes and by the Constitution.

▉ The Legislature has recognized that, like private employees, public employees have a legitimate interest in engaging in collective negotiations about issues that affect "terms and conditions of employment." *N.J.S.A.* 34:13A–5.3. However, the scope of negotiations in the public sector is more limited than in the private sector.[7] This is so because the employer in the public sector is government, which has special responsibilities to the public not shared by private employers.[8] What distinguishes

---

[7]For example, there are generally no permissive subjects of negotiation in New Jersey public employment. *Board of Education of Woodstown-Pilesgrove Regional School District v. Woodstown-Pilesgrove Regional Education Association,* 81 *N.J.* 582, 588 n.1 (1980); *Ridgefield Park Education Association v. Ridgefield Park Board of Education,* 78 *N.J.* 144, 162 (1978).

[8]Thus, we have consistently held that federal precedents concerning the scope of collective bargaining in the private sector are of little value in determining the permissible scope of negotiability in the public sphere. *In the Matter of Paterson Police PBA Local No. 1 v. Paterson,* 87 *N.J.* 78, 90 (1981); *Ridgefield Park,* 78 *N.J.* at 159. For this reason, the United States Supreme Court decision holding subcontracting to be a negotiable subject in the context of a private employer is not persuasive authority in this case. *See*

the State from private employers is the unique responsibility to make and implement public policy. *In the Matter of Paterson Police PBA Local No. 1 v. Paterson*, 87 *N.J.* 78, 86 (1981); *State v. State Supervisory Employees Ass'n*, 78 *N.J.* 54, 67 (1978).

Matters of public policy are properly decided, not by negotiation and arbitration, but by the political process. This involves the panoply of democratic institutions and practices, including public debate, lobbying, voting, legislation and administration. We have stated that

the very foundation of representative democracy would be endangered if decisions on significant matters of governmental policy were left to the process of collective negotiations ... Our democratic system demands that governmental bodies retain their accountability to the citizenry. [*Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed.*, 78 *N.J.* 144, 163 (1978)]

We have therefore divided subjects of public employment negotiation into two categories: "mandatorily negotiable terms and conditions of employment and non-negotiable matters of governmental policy." *Id.* at 162.

■ The role of the courts in a scope of negotiations case is to determine, in light of the competing interests of the State and its employees, whether an issue is appropriately decided by the political process or by collective negotiations. In making this sensitive determination, the mere invocation of abstract categories like "terms and conditions of employment" and "managerial prerogatives" is not helpful.[9] To determine whether a subject is negotiable, the Court must balance the competing interests by considering the extent to which collective negotiations will impair the determination of governmental policy.

---

*Fibreboard Paper Products Corp. v. NLRB*, 379 *U.S.* 203, 85 *S.Ct.* 398, 13 *L.Ed.2d* 233 (1964).

[9]Several of the most esteemed legal theorists of our century have addressed themselves to the fallacies of reasoning from abstract categories. *See* John Dewey, "Logical Method and the Law," 10 *Cornell L.Q.* 17 (1924); Roscoe Pound, "Mechanical Jurisprudence," 8 *Colum.L.Rev.* 605 (1908); Felix Cohen, "Transcendental Nonsense and the Functional Approach," 35 *Colum.L.Rev.* 809 (1935).

■ Our opinions on public employment have established a three-part test for scope of negotiations determinations.[10] First, a subject is negotiable only if it "intimately and directly affect[s] the work and welfare of public employees. . . ." *In re Paterson Police PBA*, 87 *N.J.* at 86; *Bd. of Ed. of Woodstown-Pilesgrove v. Woodstown-Pilesgrove Ed. Ass'n*, 81 *N.J.* at 591; *State v. State Supervisory Employees Ass'n*, 78 *N.J.* at 67. The prime examples of subjects that fall within this category are rates of pay and working hours. *Bd. of Ed. of Woodstown-Pilesgrove v. Woodstown-Pilesgrove Ed. Ass'n*, 81 *N.J.* at 589. Any subject which does not satisfy this part of the test is not negotiable.

■ Second, an item is not negotiable if it has been preempted by statute or regulation. If the Legislature establishes a specific term or condition of employment that leaves no room for discretionary action, then negotiation on that term is fully preempted. If the statute sets a minimum or maximum term or condition, then negotiation may be confined within the parameters established by these limits. *State v. State Supervisory Employees Ass'n*, 78 *N.J.* at 80–82; *N.J.S.A.* 34:13A–8.1. However, the mere existence of a statute or regulation relating to a given term or condition of employment does not automatically preclude negotiations. Negotiation is preempted only if the "statutory or regulatory provisions . . . speak in the imperative

---

[10]For a full history of public employment scope of negotiations law in New Jersey, *see In the Matter of Paterson Police PBA Local No. 1 v. Paterson*, 87 *N.J.* 78 (1981); *Bd. of Ed. of Woodstown-Pilesgrove v. Woodstown-Pilesgrove Ed. Ass'n*, 81 *N.J.* 582 (1980); *State v. State Supervisory Employees Ass'n*, 78 *N.J.* 54 (1978); *Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed.*, 78 *N.J.* 144 (1978); *Dunellen Bd. of Ed. v. Dunellen Ed. Ass'n*, 64 *N.J.* 17 (1973). *See also* Carlson (Note), "Public Sector Labor Relations: The New Jersey Supreme Court Interprets the 1974 Amendments to the Employer-Employee Relations Act," 32 *Rutgers L.Rev.* 62 (1979); Moore (Comment), "After *Ridgefield Park* and *State Supervisory Employees*: The Scope of Collective Negotiations in the Public Sector in New Jersey," 10 *Seton Hall L.Rev.* 558 (1980).

■

and leave nothing to the discretion of the public employer."
*State v. State Supervisory Employees Ass'n,* 78 *N.J.* at 80.

Third, a topic that affects the work and welfare of public
employees is negotiable only if it is a matter "on which negotiat-
ed agreement would not *significantly* interfere with the exercise
of inherent management prerogatives pertaining to the determi-
nation of governmental policy." *In re Paterson Police PBA,* 87
*N.J.* at 86; *Woodstown-Pilesgrove,* 81 *N.J.* at 591; *State v.
State Supervisory Employees Ass'n,* 78 *N.J.* at 67 (emphasis
added in *Woodstown-Pilesgrove* ). This principle rests on the
assumption that most decisions of the public employer affect the
work and welfare of public employees to some extent and that
negotiation will always impinge to some extent on the determi-
nation of governmental policy. *In re Paterson Police PBA,* 87
*N.J.* at 91–92. The requirement that the interference be "sig-
nificant" is designed to effect a balance between the interests of
public employees and the requirements of democratic decision
making. As Justice Schreiber wrote in *Woodstown-Pilesgrove,*

> The nature of the terms and conditions of employment must be considered in
> relation to the extent of their interference with managerial prerogatives. A
> weighing or balancing must be made. When the dominant issue is [a govern-
> mental] goal, there is no obligation to negotiate and subject the matter,
> including its impact, to binding arbitration. Thus these matters may not be
> included in the negotiations and in the binding arbitration process even though
> they may affect or impact upon the employees' terms and conditions of employ-
> ment. [81 *N.J.* at 591]

Thus negotiation will be allowed on a subject that intimately
and directly affects the work and welfare of public employees
unless such negotiated agreement would significantly interfere
with the determination of governmental policy.

To summarize, a subject is negotiable between public employ-
ers and employees when (1) the item intimately and directly
affects the work and welfare of public employees; (2) the
subject has not been fully or partially preempted by statute or
regulation; and (3) a negotiated agreement would not signifi-
cantly interfere with the determination of governmental policy.
To decide whether a negotiated agreement would significantly

interfere with the determination of governmental policy, it is necessary to balance the interests of the public employees and the public employer. When the dominant concern is the government's managerial prerogative to determine policy, a subject may not be included in collective negotiations even though it may intimately affect employees' working conditions.

## III

## CONTRACTING AND SUBCONTRACTING

The proposed contract provision at issue in *State Supervisory Employees Ass'n* states:

The State shall meet with the Association to *negotiate* all incidents of contracting or subcontracting whenever it becomes apparent that a layoff or job displacement might result. [Article XXXII (emphasis added)]

The contract provision in *Local 195* states:

The State agrees to meet with the Union to *discuss* all incidences of contracting or subcontracting whenever it becomes apparent that a layoff or job displacement will result. [Article XXXIV (emphasis added)]

These provisions would require negotiation or discussion only if subcontracting might result in layoffs or displacement. "Nothing more directly and intimately affects a worker than the fact of whether or not he [or she] has a job." *State v. State Supervisory Employees Ass'n,* 78 *N.J.* at 84. The clause clearly meets the requirements of the first part of the test for negotiability.

We next decide whether negotiation about subcontracting has been preempted by statute. One possible source of preemption is the Civil Service statutes, by which the Legislature established a merit system for the selection, appointment, classification and discharge of public employees. *N.J.S.A.* 11:4–1 to –9; see *N.J.Const.* (1947), Art. VII, § 1, par. 2. Local 195 argues that subcontracting is inconsistent with the merit and fitness requirement of *N.J.S.A.* 11:4–2 and therefore should not be permitted. Although the Civil Service laws constrain the discretion of the State in selecting employees, they do not prevent the State from subcontracting where appropriate. In-

deed, several New Jersey statutes specifically empower certain agencies to engage in subcontracting.[11]

Neither the Constitution nor the Civil Service laws require that all State functions be carried out by civil service employees. *See New Jersey Sports & Exposition Authority v. McCrane*, 119 *N.J.Super.* 457, 546–48 (Law Div.1971), modified on other grounds, 61 *N.J.* 1 (1972), appeal dis., 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.2d* 215 (1972), after remand, 62 *N.J.* 248 (1973), *cert.* den., 414 *U.S.* 989, 94 *S.Ct.* 291, 38 *L.Ed.2d* 228 (1973); *State Troopers Fraternal Association v. State*, 115 *N.J.Super.* 503, 507 (Ch.Div.1971), aff'd, 119 *N.J.Super.* 375 (App.Div.1972), aff'd, 62 *N.J.* 302 (1973) (both holding that the constitutional "merit and fitness" requirement did not prevent the Legislature from excluding certain public employees from the Civil Service law). We express no opinion on whether subcontracting in a particular instance might violate the constitutional and statutory merit requirements. We simply reiterate that the ability to contract out work, as such, does not contravene the merit and fitness requirements. The Civil Service statutes do not create a blanket prohibition against subcontracting.

A second possible source of preemption is *N.J.A.C.* 4:1–16.1, which states that the "appointing authority may lay off an employee in the classified service for purposes of efficiency or economy or other valid reason requiring a reduction of the number of employees in a given class." However, this provision grants considerable discretion to the appointing authority. It neither speaks in the imperative nor sets specific maximum or minimum terms or conditions. *See State v. State Supervisory Employees Ass'n,* 78 *N.J.* at 80–82. Thus, the regulation does not preempt subcontracting as a negotiable subject.

---

[11]*See*, for example, *N.J.S.A.* 52:18A–140 (granting the Division of Data Processing and Telecommunications the power to consider the use of consulting firms and purchase of information processing services); *N.J.S.A.* 52:18A–167 (empowering the State Employees Deferred Compensation Board to delegate administration of a plan under which employees may defer receipt of salaries).

Finally, we consider whether negotiation on the substantive decision to contract or subcontract would significantly interfere with the determination of governmental policy.[12] The issue of subcontracting does not merely concern the proper technical means for implementing social and political goals. The choice of how policies are implemented, and by whom, can be as important a feature of governmental choice as the selection of ultimate goals. *See North Bergen Bd. of Ed. v. No. Bergen Fed'n of Teachers*, 141 *N.J.Super.* 97, 103 (App.Div.1976) ("the board's right to select [the best qualified] candidates from within or without the system involves major educational policy and as such must be considered a managerial prerogative"). It is a matter of general public concern whether governmental services are provided by government employees or by contractual arrangements with private organizations. This type of policy determination does not necessarily concern solely fiscal considerations. It requires basic judgments about how the work or services should be provided to best satisfy the concerns and responsibilities of government. Deciding whether or not to contract out a given government service may implicate important tradeoffs.

---

[12]The majority in the Appellate Division did not reach this issue. *See* 176 *N.J.Super.* 85 (1980). The court stated that the initial inquiry is a determination of the nature of the decision of the employer. "If the public employer has acted pursuant to a managerial prerogative, the inquiry may end at this point." 176 *N.J.Super.* at 91, citing *Woodstown-Pilesgrove,* 81 *N.J.* at 588. This does not properly apply the test of *Woodstown-Pilesgrove.*

Justice Schreiber, writing for a unanimous Court in *Woodstown-Pilesgrove*, held that if the subject is a matter of "essential managerial prerogative which has been delegated by the Legislature to the Board of Education, it cannot be bargained away.... In other circumstances whether the function falls within the general category of management authority is only the first phase of the analysis." 81 *N.J.* at 589 [citation omitted] Thus, when a subject has not been preempted by statute or regulation, it is necessary to ask whether "negotiated agreement would not *significantly* interfere with the exercise of inherent management prerogatives." *Id.* at 591, quoting *State v. State Supervisory Employees Ass'n*, 78 *N.J.* at 67 (emphasis supplied in *Woodstown-Pilesgrove* ).

Allowing such decisions to be subject to mandatory negotiation would significantly impair the ability of public employers to resort to subcontracting. We have previously held that decisions to reduce the work force for economy or efficiency are non-negotiable subjects. *State v. State Supervisory Employees Ass'n*, 78 *N.J.* at 88. *See In the Matter of Maywood Bd. of Ed. and Maywood Ed. Ass'n*, 168 *N.J.Super.* 45, 55 (App.Div.1979), certif. den., 81 *N.J.* 292 (1979). The decision to contract out work or to subcontract is similarly an area where managerial interests are dominant. This is highlighted by the fact that allowing subcontracting to be negotiable may open the road to grievance arbitration. Imposing a legal duty on the state to negotiate all proposed instances of subcontracting would transfer the locus of the decision from the political process to the negotiating table, to arbitrators, and ultimately to the courts. The result of such a course would significantly interfere with the determination of governmental policy and would be inimical to the democratic process. *See Bd. of Ed. of Bernards Tp. v. Bernards Tp. Ed. Ass'n*, 79 *N.J.* 311, 321–22 (1979); *Kearny PBA Local # 21 v. Kearny*, 81 *N.J.* 208, 215 (1979).

We therefore hold that to the extent the contractual provision at issue in *State Supervisory Employees' Ass'n* includes negotiation on the ultimate substantive decision to subcontract, it is a non-negotiable matter of managerial prerogative. We recognize that our ruling on subcontracting is at odds with decisions in other jurisdictions. *Unified School Dist. No. 1 of Racine County v. Wisconsin*, 81 *Wis.*2d 89, 259 *N.W.*2d 724 (1977); *In re Saratoga Springs City School Dist. v. New York State Public Employment Relations Bd.*, 68 *A.D.*2d 202, 416 *N.Y.S.*2d 415 (App.Div.1979); *Van Buren Public School Dist. v. Wayne Cty. Circuit Judge*, 61 *Mich.App.* 6, 232 *N.W.*2d 278 (Ct.App.1975). These decisions rest on the assumption that subcontracting "does not represent a choice among alternative social or political goals or values." *Unified School Dist., etc.*, 259 *N.W.*2d at 732; *In re Saratoga Springs, etc.*, 416 *N.Y.S.*2d at 419. As we have stated, we do not agree that the decision to contract out

work necessarily concerns merely the technical means of implementing policy. The decision can be an important policy choice in its own right.

These out-of-state decisions also emphasize the wisdom of pursuing discussion between public employers and employees. *See, e.g., Van Buren Public School, etc.,* 232 *N.W.*2d at 288. We fully agree that such discussions are valuable and should be fostered. They would undoubtedly promote labor peace and harmony, a major goal of the New Jersey Employer-Employee Relations Act. *N.J.S.A.* 34:13A–2. Moreover, they may even result in greater efficiency or economy. If a public employer is considering subcontracting as a means to achieve these goals, employees may be motivated to suggest changes in working conditions that could accomplish the same or better results.

For these reasons, we fully expect that discussion between public employers and employees will be undertaken by the State. It is clearly in the interest of the State to do so. At oral argument, the representatives of the State voiced a commitment to pursue discussion with public employees before resorting to subcontracting. This is altogether appropriate. We do not mean to stifle discussion. We encourage it. State officials would be derelict in their public responsibilities if they did not pursue such discussions.

To this end, we hold that a public employment contract may include a provision reciting an agreement by the State to *discuss* decisions to contract or subcontract whenever it becomes apparent that a layoff or job displacement will result, if the proposed subcontracting is based on solely fiscal considerations. In such situations, the public would clearly benefit from suggestions by public employees directed toward improving economy or efficiency. While the public employees have no right to negotiate on the ultimate decision to subcontract, they may have a procedural right to present their position on the economic issue. Thus, for example, they could seek to show the employer that the employees are willing to perform the same job at a price competitive with the private replacements.

Discussion of subcontracting which is contemplated for purely fiscal reasons does not implicate governmental policy to the extent that it would if the decision were based on non-fiscal reasons. Replacing public employees with private employees solely to save money does entail a choice about the level of government spending, a matter of great public concern. However, discussion about such a replacement would not significantly interfere with the determination of public goals. In fact, as we have explained, such discussions would be in the public interest, since employees could demonstrate that they would do the same work more efficiently than a private contractor.

In *Local 195*, the contract provision would be acceptable if it limited discussion to occasions of subcontracting or contracting likely to result in job layoffs only when the subcontracting is done solely for fiscal or economic reasons. However, as written, the provision is overly broad. Placing a legal duty on the State to discuss subcontracting when proposed for broader policy purposes would place too great a burden on the determination of governmental policy. Only when the contracting out is proposed for purely economic reasons does the employee interest in discussion of alternative solutions become dominant.

Both contract provisions appear to allow negotiation or discussion not only on the ultimate issue of subcontracting but on the effects of subcontracting on public employees. To the extent the provisions impose a duty on the State to negotiate procedural aspects of the subcontracting decision as they affect employees, the clauses are negotiable. For example, negotiation could occur on the issue of adequate notice to employees that they are going to be laid off. We have held that, although substantive policy decisions may be non-negotiable matters, procedural aspects of the decision are negotiable. *State v. State Supervisory Employees Ass'n*, 78 *N.J.* at 90–91. Negotiation about the procedures for laying off employees will not significantly interfere with the underlying policy determination. They are therefore negotiable terms and conditions of employment.

■ We emphasize that our holding today does not grant the public employer limitless freedom to subcontract for any reason. The State could not subcontract in bad faith for the sole purpose of laying off public employees or substituting private workers for public workers. State action must be rationally related to a legitimate governmental purpose. Our decision today does not leave public employees vulnerable to arbitrary or capricious substitutions of private workers for public employees.

We conclude that, as written, both proposed contractual provisions relating to contracting and subcontracting are non-negotiable matters of managerial prerogative.

## IV

### WORKWEEK PROVISIONS

■ The workweek provision in dispute in *State Supervisory Employees Association* states: [13]

Where practicable: the normal workweek shall consist of five (5) consecutive workdays. [Article VIII, A.3.]

We find that this provision intimately and directly affects the work and welfare of public employees.

We further find that the clause is not preempted by statute. The disputed provision does not constrain the right of the State to determine the number or classification of employees on duty at any time. It merely governs negotiations concerning which employees within a given classification will work at any particular time. No statutes set the workweek for individual employees. *N.J.S.A.* 52:14–17.13 and –17.14 merely provide that the basic workweek shall be 40 hours, where practicable, and that any employee working longer than this shall receive overtime. Like *N.J.A.C.* 4:1–18.1 and –18.2, these provisions leave consider-

---

[13]PERC held this provision negotiable, *In re State and State Supervisory Employees Ass'n,* PERC No. 80–19, 5 *NJPER* 381 (1979), and the Appellate Division affirmed, *In re State and State Supervisory Employees Ass'n,* Docket Nos. A–463–79; A–509–79 (December 17, 1980).

able discretion to the public employer in deciding who shall work when. Likewise, *N.J.S.A.* 11:14–1 empowers certain administrative officials of the Civil Service to prepare regulations concerning work hours, holidays, attendance and leaves of absence. This statute again leaves considerable discretion to public authorities.

We have previously held that, while the establishment of a school calendar, *In re Burlington Cty. College Faculty Ass'n v. Bd. of Trustees,* 64 *N.J.* 10 (1973), or the hours of instruction in a school day, *Woodstown-Pilesgrove, supra,* are non-negotiable subjects, the days and hours worked by individual employees are negotiable. The contract provision in this case concerns the negotiable subject of individual work schedules rather than the formation of an overall calendar. The provision does not interfere with the State's power to determine the number of classification of employees working at any given time. Nor does it interfere with the determination of the hours or days during which a service will be operated. The Association wishes only to negotiate the hours of employment of individual employees within the system established by the State. Negotiation on this issue will not significantly interfere with the determination of governmental policy, particularly since the term applies only "[w]here practicable." It is true that negotiation on the issue of practicability would impinge on the State's power to deviate from the provision. Nonetheless, the interests of the employees predominate and negotiation on the subject would not significantly interfere with determination of governmental policy.[14]

We therefore conclude that the workweek provision in dispute is a negotiable term and condition of employment.

[14]We do not hold that the decision as to which employees are working at a given time would never significantly interfere with the determination of governmental policy. In certain instances, such a decision may impinge on the ability of the governmental entity to determine policy. *Cf. Irvington PBA v. Irvington,* 170 *N.J.Super.* 539 (App.Div.1979) (holding that a municipal decision to initiate a three-shift work schedule that rotates around the clock for police officers is a non-negotiable matter of managerial prerogative).

V

## TRANSFER AND REASSIGNMENT PROVISIONS

■ The transfer and reassignment provisions in dispute in *State Supervisory Employees Association* are as follows: [15]

---

[15]The provisions not in dispute are as follows:

A. Transfer

2. d. The rights of an employee who has voluntarily transferred shall not be adversly [*sic*] affected except that he shall not retain any rights in the unit from which he has transferred.

e. The rights of an employee who has involuntarily transferred shall not be adversely affected but he shall retain no rights in the unit from which he has been transferred except that if he is on a promotional list, his name shall be retained on the promotional eligible list for the unit from which he has been transferred until he has had an opportunity to take a promotional examination in his new unit and the resultant list has been promulgated. Nothing herein is intended to diminish the rights of employees resulting from a layoff.

f. Transfer shall not affect the accumulation of an employee's State or job classification seniority.

3. Upon any transfer of a permanent employee, all sick leave and vacation balances shall be transferred with the employees, except that:

a. Upon voluntary transfer, all accrued compensatory time will, at the discretion of the State, be transferred with the employee, taken as time off prior to transfer or paid in cash at the employee's current rate of pay.

b. Upon involuntary transfer of a permanent employee, all accrued compensatory time balances shall be transferred with the employee.

4. An employee may request a transfer through his Personnel Officer in accordance with the procedures outlined in Civil Service Personnel Manual Subpart 15–1.101. If there is no opportunity for reassignment or lateral title change within the employee's present organization unit or department, the employee may complete a transfer request form and forward it to the Department of Civil Service, which retains such form for six (6) months and sends to the Personnel Officer of each department on a monthly basis a list of individuals by title and code number who are interested in transfer.

B. Reassignment

9. Salary steps, seniority or like substantive rights shall not be adversly [*sic*] affected by reassignment unless otherwise specifically set forth herein.

A. Transfer

1. Transfer is the movement of an employee from one job assignment to another within his job classification in another organizational unit or department.

2. An employee shall not be transferred without the approval and consent of the appointing authority from and to whose unit the transfer is sought nor without the consent of the employee, or the approval of the Department of Civil Service, except that:

a. The consent of the employees shall not be required when the employee movement is the result of a transfer or combining of functions of one unit to or with another;

b. When a temporary transfer is made, the consent of the employee shall not be required; but if the employee objects, he shall have the right to have the transfer reviewed by the Department of Civil Service.

c. Any special hardship that may result will be given due consideration.

3. c. When accepted for transfer by an organizational unit or department, the request for transfer shall not be unreasonably withheld by the organizational unit or department where the individual is employed.

B. Reassignment

1. Reassignment is the movement of an employee from one job assignment to another within his job classification and within the work unit, organizational unit or department.

2. Reassignments of employees may be made in accordance with the fiscal responsibilities of the appointing authority; to improve or maintain operational effectiveness, or to provide employee development and job training or a balance of employee experience in any work area. Where such reassignments are not mutually agreed to, the appointing authority will make reassignments in the inverse order of the job classification seniority of the employees affected, given the above conditions, providing the employees are capable of doing the work. Any special hardship that may result will be given due consideration.

3. When temporary reassignments are made to achieve any of the objectives in B.2. above, employees to be affected will be given maximum possible notice. The consideration of seniority otherwise applicable in reassignments will not apply. The utilization of the concept of temporary reassignments will not be used unreasonably.

4. When personnel changes in a work unit provide opportunities for shift or schedule changes, interested employees may apply for desired assignments to the work unit supervisor. Such changes in assignment will be made on the basis of the job classification seniority of employees requesting the change, except that priority is given to the assignment of individual employees as provided in B.2. above.

5. When a vacancy is filled by an employee from outside a work unit, the employee joining that work unit shall be assigned the open position on the shift and work schedule which were appropriate to the openings.

6. a. Where the principles in B.2. above are observed, requests for voluntary reassignment within the organizational unit or department shall be given consideration.

b. An employee desiring reassignment to any job in his organizational unit or department may submit an application through his supervisor in writing to his personnel officer stating the reasons for the request. Employees who are capable of performing the work and who apply for such reassignments will be considered and reassignments will be made on the basis of these requests. Where more than one request for reassignment from qualified employees deemed capable of performing the work in such a job is on record, any assignment(s) will be made on the basis of the job classification seniority of employees having recorded such a request.

7. An employee may have on record no more than two (2) requests for reassignment in 6.b. above.

8. When an employee is granted a voluntary reassignment, under provisions of 4, 5, or 6 above, he shall then be eligible for only one additional voluntary reassignment in the succeeding twelve (12) month period. Consideration will be given to a request for additional reassignment where special circumstances exist.

10. Permanent employees shall be given preference for consideration for voluntary reassignment as contrasted to provisional or probationary employees.

C. Special Requests

Requests for transfer or reassignment predicated on extreme personal hardship will be given priority consideration where positions are available which the employee is capable of performing.

D. Transfer and Reassignment (For Association Officers and Stewards)

1. The State and the Association recognize that Association Officers and Stewards have in their relationship to their jobs a need for continuity in the assigned shift and location which exceeds that of other fellow employees. It is agreed therefore that these Association Officers and Stewards will not be routinely reassigned or transferred involuntarily.

2. The State and the Association recognize the need to utilize all personnel to meet operational requirements effectively and notwithstanding the commitment in paragraph 1 above, movement of such Association Officers and Stewards may be necessary and appropriate (generally on a temporary basis) in exception to the guideline agreed to in paragraph 1. The exception used in paragraph 2. will not be used arbitrarily.

The contract provisions define a transfer as "the movement of an employee from one job assignment to another within his job classification in another organizational unit or department." [A.1] It defines reassignment as "the movement of an employee from one job assignment to another within his job classification and within the work unit, organizational unit or department." [B.1] There can be no question that the determination of where an employee works and at what tasks intimately and directly affects the employee's work and welfare. The provisions in dispute easily meet the first test for negotiability.

One possible source of preemption is *N.J.S.A.* 11:11–3. This statute provides broad powers to the chief examiner and secretary of the Civil Service Commission to promulgate rules for the transfer and reassignment of employees.[16] Since this statute is discretionary, negotiability is not preempted.

More plausible as a source of preemption are the administrative regulations relating to transfer and reassignment. *N.J.A.C.* 4:1–15.1 and –15.7 define transfer and reassignment in terms almost identical to contract provisions A.1 and B.1. *N.J.A.C.* 4:1–15.4, governing employee consent to transfer, is highly similar to contract provisions A.2, A.2.a., and A.2.b. Finally, the rule governing employee rights upon transfer, *N.J.A.C.* 4:1–15.5, is reproduced verbatim in the contract at A.2.d. and A.2.e.

The mere fact that proposed contract provisions employ the language of existing statutes or regulations does not by itself prove that the Legislature intended to take those subjects out of the realm of mandatory negotiation. The contract proposals are consistent with the regulatory language. Further, the regulations do not deprive the employer of all discretion in enforcing the rights granted. The provisions are therefore not preempted. *State v. State Supervisory Employees Ass'n*, 78 *N.J.* at 80–82.

Finally, we decide whether negotiation of the transfer and reassignment provisions would significantly interfere with the

---

[16]*N.J.S.A.* 11:11–3 provides:

> The chief examiner and secretary shall provide by rule, approved by the commission, for the transfer of employees from a position in a given class to another in the same or different department, commission, board, institution or agency, and for the periodical or occasional transfer of employees for a period not to exceed six months, without regard to class or department, commission, board, institution or agency, in order to better the distribution of persons in the service or effect economies, or make available from one or more central supply pools extra stenographic, clerical, messenger or other service needed for short periods, or provide training sought by employees or required by appointing authorities. No transfer shall be made without the approval and consent of the appointing authorities from or to whose departmental working forces the transfer is proposed.

determination of governmental policy. In *Ridgefield Park*, we held that teacher transfers and reassignments are not mandatorily negotiable terms and conditions of employment. 78 *N.J.* at 156. For the reasons expressed there, the substantive decision to transfer or reassign an employee is preeminently a policy determination. The power of the employer to make the policy decision would be significantly hampered by having to proceed through negotiation. *Id.*

Nonetheless, we have distinguished between substantive policy making powers of employers and procedural rights of employees. We have held that promotional procedures are negotiable terms and conditions of employment even though promotional criteria are not. *State v. State Supervisory Employees Ass'n*, 78 *N.J.* at 90–91. Negotiation about the procedures for implementing transfers and reassignment similarly will not significantly interfere with the underlying substantive policy determination. We therefore conclude that contract provisions relating to the procedures for transferring and reassigning public employees are negotiable terms and conditions of employment.

We agree with the findings of PERC and the Appellate Division that the following provisions related to substantive criteria for transfer and were therefore non-negotiable matters of managerial prerogative: A.1., A.2., A.2.a., A.2.b., A.2.c., A.3.c., B.1., B.2., B.5., B.8., B.10., and C. Finally, we affirm the holding that only the first sentences in B.4. and B.6.b. are negotiable.[17]

Both PERC and the Appellate Division held that clause B.7. was a negotiable term and condition of employment. We disagree and reverse. The provision limits the number of requests for reassignment that an employee may have on record. As such, the clause limits the ability of the employer to know which

---

[17]PERC and the Appellate Division found that the following provisions were procedural and therefore mandatorily negotiable. A.2.d., A.2.e., A.2.f., A.3., A.3.a., A.3.b., A.4., and B.9. These rulings were not challenged on appeal.

employees desire a reassignment. While this may further employee interests by equalizing the chances for reassignment, it significantly interferes with the information available to the employer. It therefore impinges on the ability of the employer to make rational decisions on how best to reassign employees to achieve the greatest efficiency. We therefore hold that it is a non-negotiable subject of managerial prerogative.

On several clauses, there was a difference of opinion between PERC and the Appellate Division. They agreed as to the first and last sentence of B.3., but disagreed as to the second. We affirm their finding that the first sentence of B.3. is negotiable since it concerns the employee's procedural right of notice with respect to reassignments. We also agree that the last sentence is not negotiable since it concerns the substantive criteria for reassignment. The second sentence states that when temporary assignments are made, "consideration of seniority otherwise applicable in reassignments will not apply." PERC found this clause to be negotiable and the Appellate Division reversed. We affirm the Appellate Division finding that this provision related to the substantive criteria for reassignment and is therefore non-negotiable.

The Appellate Division partially reversed PERC's finding that clause B.6.a. was non-negotiable. The clause states that "[w]here the principles in B.2. above are observed, [requests for voluntary reassignment within the organizational unit or department shall be given consideration]." The phrase in brackets was held negotiable by the Appellate Division. We reverse. Clause B.2. relates to substantive criteria for reassignment. Read in that context, B.6.a. involves not a procedural right to be heard, but a duty on the employer which impinges on the substantive reassignment decision. It is therefore non-negotiable.

Finally, we address the provisions at D.1. and D.2. relating to limits on the employer's power to transfer and reassign Association officers and stewards. The Appellate Division reversed

PERC's holding that the terms were negotiable on the grounds that they would limit the substantive right of management to transfer employees. In this case, we make an exception to the rule that provisions relating to the substantive criteria for transfer are non-negotiable. While the provisions do impinge on the ability of the employer to decide who will be transferred or reassigned, we conclude that in this instance the interest of the employees predominates over the minimal interference with the employer's policy choices. The clauses are limited in scope and do allow transfers of officers and stewards to meet operational requirements. We therefore hold that negotiation on these provisions would not significantly interfere with the formulation or implementation of public policy and we reverse the Appellate Division.

As to Justice Handler's dissent on this point, we can only say that our judgment of the balance of interests differs from his. We agree that it would be an unfair labor practice for a public employer to transfer or assign union officials for the purpose of retaliation or coercion of employees' rights. (At 400–401). However, protection against improper transfers is not the only employee interest at stake. Even when the government has a legitimate reason for transferring union officials, such as economy or efficiency in the delivery of public services, the employees have a countervailing interest in continuity of the relationship between employees and their bargaining representatives. It is true that allowing negotiation on the issue of the transfer of union officials will interfere somewhat with the determination of governmental policy. However, we do not believe the interference will be significant, since the class of employees involved is relatively small and the restriction on transfers is limited in scope. Because the employee interest is dominant, the issue is negotiable.

## CONCLUSION

We hold that in public employment law, the substantive decision to subcontract or to contract out work is a non-negotia-

ble subject of managerial prerogative. However, a public employment contract could contain a provision requiring the State to discuss the economic aspects of subcontracting contemplated for purely fiscal reasons when a job layoff may result. Moreover, negotiation may take place on the procedural aspects of subcontracting as they affect public employees. The provision relating to the workweek is negotiable. As elaborated in this opinion, transfer and reassignment provisions relating to procedure are negotiable while those relating to the substantive criteria for transfer or reassignment are not. The provisions relating to the transfer or reassignment of Association officers and stewards are mandatorily negotiable, as written.

Affirmed in part and reversed in part.

HANDLER, J., concurring and dissenting.

I have only one point of difference with the majority's disposition of this case. I cannot agree that the transfer and reassignment of union officers and shop stewards should be a mandatory subject for collective negotiations. I therefore dissent on that single point.

At the outset let me note that I fully subscribe to the majority's analytical approach for determining whether a particular subject is mandatorily negotiable. The Court has correctly reaffirmed the principles expressed in *Bd. of Ed. of Woodstown-Pilesgrove v. Woodstown-Pilesgrove Ed. Ass'n*, 81 *N.J.* 582 (1980), which require a balancing of competing interests to make scope-of-negotiation determinations. This approach does not depend on the talismanic application of labels such as "terms and conditions of employment" or "managerial prerogatives." Rather, the inquiry focuses on the extent to which collective negotiations will interfere with the establishment and effectuation of governmental policy. Negotiation is required only for those terms and conditions of employment "which intimately and directly affect the work and welfare of public employees and on which negotiated agreement would not significantly

interfere with the exercise of inherent management preroga-
tives pertaining to the determination of governmental policy."
*Id.* at 591, quoting *State v. State Supervisory Employees Ass'n,*
78 *N.J.* 54, 67 (1979).

In applying this balancing test to the subject of transfers and
reassignments, the majority properly holds that such matters
are not mandatorily negotiable because the substantive decision
to transfer or reassign an employee is preeminently a govern-
mental policy decision which would be significantly encumbered
or impaired if it were subject to mandatory negotiation. *Ante*
at 416. See *Ridgefield Park Education Association v. Ridge-
field Park Board of Education,* 78 *N.J.* 144, 156 (1978). In
drawing a distinction between the public employer's *substantive*
decision to transfer or assign employees and the *procedural*
process to be followed in making such decisions, the majority
clearly recognizes that the former constitutes inherent manage-
rial prerogatives, while the latter does not. Hence, I agree with
the majority that *procedures* for implementing substantive deci-
sions relating to transfers and reassignments are subject to
mandatory negotiation because procedural matters pose no sig-
nificant threat of interference with the public employer's ability
to make substantive policy determinations. *Ante* at 417. See
*State Supervisory,* 78 *N.J.* at 90–91.

Nevertheless, the Court deviates from this sound and logical
analysis when it focuses more narrowly upon the question of
transfers of union officials and shop stewards. While the ma-
jority acknowledges that negotiation on such matters would
"impinge on the ability of the employer to decide who will be
transferred or reassigned," it concludes that, in this one area,
"the interest of the employees predominates over the minimal
interference with the employer's policy choices." *Ante* at 419.

The majority does not explain why this is so. The majority
simply takes an inconsistent position on these transfer/assign-
ment questions. It refuses to require negotiation regarding the
transfer or assignment of employees in general because of the

"significant interference" that would pose to the formulation of government policy, yet it finds, without explication, that the infringement on policy-making functions is only "minimal" when these decisions involve an employee who at the time of decision happens to hold a union position.

From the employer's standpoint, it is no less an interference with the implementation of governmental policy to have to negotiate the transfer or assignment of an employee who holds a union office, than it would be regarding any other employee. Our balancing approach requires us to determine the extent to which collective negotiations will interfere with the exercise of government policy. Where negotiation on a particular subject would cause significant interference with policy-making functions, it will not be required. Therefore, since, as the majority itself points out, subjecting employee transfer and assignment questions to negotiation would significantly interfere with the effectuation of government policy, I would affirm the finding of the Appellate Division that the transfer and reassignment of all employees, regardless of union status, is nonnegotiable.

Nevertheless, I share the majority's justifiable concern for public employees who enjoy union leadership and responsibility. Union officials and shop stewards can be the target of employer victimization because of their very visible and vocal position as employee representatives. Transfers of such persons may be for improper purposes, such as to silence them or to cut them off from the very working environment where they are needed most. Such improper or retaliatory measures by management against union officers can breed disruption and instability in labor relations and can disserve the proper administration of collective bargaining, grievance procedures and other cooperative union practices. See, *e.g., Aeronautical Industrial Dist. Lodge v. Campbell*, 337 *U.S.* 521, 69 *S.Ct.* 1287, 93 *L.Ed.* 1513 (1949); *D'Amico v. NLRB*, 582 *F.*2d 820 (3 Cir. 1978) (relating to private sector labor relations).

The majority attempts to address these real concerns by requiring mandatory negotiation on the transfer or assignment of such officials. There is, however, a much more direct, effective and pragmatic way to defend against nefarious managerial decisions designed to remove or weaken union leadership. I would not hesitate to consider it an unfair practice under the New Jersey Employer-Employee Relations Act, *N.J.S.A.* 34:13A–5 *et seq.*, for a public employer to transfer or assign union officials or shop stewards for impermissible reasons or for motives ulterior to the legitimate needs of government to promote efficiency and economy in the delivery of public services. Our Act specifically prohibits public employers from interfering with the functioning of employee organizations or from coercing employees by burdening terms and conditions of employment in order to discourage employees from exercising their guaranteed rights. *N.J.S.A.* 34:13A–5.4(a)(1), (2) and (3). Any employee transfer or assignment which separates union leaders from their membership must be scrupulously scrutinized to determine whether the public employer has violated these statutory standards by acting out of anti-union animus or bad faith for reasons unrelated to proper governmental ends.

In the private sector federal courts have often found unfair labor practices where an employee's transfer, demotion, discharge or layoff was related to the employee's union activities. See, *e.g., Osteopathic Hospital Founders Ass'n v. NLRB*, 618 F. 2d 633, 636–637 (10 Cir. 1980) (hospital refused to promote union activist and failed to hire two others because of their union activities); *NLRB v. Marmon Transmotive*, 551 F.2d 733 (6 Cir. 1977) (employer threatened not to promote employees who filed grievances and failed to promote employees who did file grievances); *Cameron Iron Works, Inc. v. NLRB*, 464 F.2d 609 (5 Cir. 1972) (company issued employee an ultimatum to either resign his post as union steward or face demotion); *Food Store Emp. Union, Local 347 v. NLRB*, 418 F.2d 1177 (D.C.Cir.1969) (employee who helped union organize and refused to assist company president in spying on union activities transferred out of that

unit); *Steves Sash & Door Co. v. NLRB*, 401 *F*.2d 676 (9 Cir. 1968) (employees offered promotion into supervisory jobs so that they would have to discontinue union activity). In addition, courts have invoked state labor laws to find unfair labor practices where an employee's job status changed after engaging in union activities. See, *e.g., Trustees of Forbes Library v. Labor Relations Commission*, —— *Mass.* ——, 428 *N.E.*2d 124 (1981); *Pennsylvania Labor Relations Board v. Ficon*, 434 Pa. 383, 254 *A.*2d 3 (1969); *St. Joseph Hospital v. Pennsylvania Labor Relations Board*, 16 *Pa.Cmwlth.* 533, 330 *A.*2d 561 (Commw.Ct.1974).

Moreover, this Court has recognized that "[i]t would certainly constitute an unfair labor practice if public employees, having engaged in lawful organizational activities, were to be penalized or denied promotions because of that protected participation." *Hackensack v. Winner*, 82 *N.J.* 1, 20 (1980). Our public Employer-Employee Relations Act focuses upon unfair labor practices as an appropriate area for administrative remediation. *N.J.S.A.* 34:13A–5.4. Thus, unfair labor practice charges are clearly an available and preferred means for addressing transfer or assignment controversies involving union officials.

Because of the inherently suspect nature of transfers or reassignments of union officials, it may well be that circumstances would exist in which the public employer's decision to shift such an employee would support an unfair practice charge, even without a detailed showing that the decision was made in bad faith or motivated specifically by anti-union animus. *Cf. Saginario v. Attorney General*, 87 *N.J.* 480, 497 (1981) (Clifford, J., concurring and dissenting) (union's failure to give notice to employee of grievance proceeding contrary to his interest found to be unfair practice under *N.J.S.A.* 34:13A–5.4). However, in this case we are not presented with the question of what standard or test applies to determine whether decisions to transfer or assign union officers and stewards can constitute an unfair practice under the Public Employer-Employee Relations Act.

I believe that it would suffice on this point to identify the statutory and administrative weaponry that is available to vindicate the rights guaranteed public employees under the New Jersey Employer-Employee Relations Act. Genuine concerns for the strength and welfare of public employee organizations arising from potential threats directed against union leadership by public employers can be adequately defensed and redressed under the Act. I am sure that these same concerns have induced the majority to invoke mandatory negotiation as a solution. As I have indicated, this route is cumbersome, inappropriate and potentially disruptive of governmental management. Moreover, the Act itself provides a sound and effective remedy for these problems. Therefore, I dissent from the majority's conclusion on this particular issue.

O'HERN, J., concurring in part and dissenting in part.

## I.

I agree with the majority's statement of the applicable principles: a subject is negotiable between public employers and employees when (1) the item intimately and directly affects the work and welfare of public employees; (2) the subject has not been fully or partially preempted by statute or regulation; and (3) a negotiated agreement would not significantly interfere with the determination of governmental policy.[1]

While federal cases are not of significant value in determining the scope of negotiations in the public sector, their reasoning as to what has an economic impact upon a worker is relevant. The Supreme Court noted in *First National Maintenance Corp. v. N. L. R. B.*, 452 *U.S.* 666, 101 *S.Ct.* 2573, 69 *L.Ed.*2d 318, 325

---

[1]Labor negotiations involving police or firefighters are governed by principles that differ in some respects from those generally applicable to public sector collective bargaining. See, *e.g., In the Matter of Paterson Police PBA Local No. 1. v. Paterson*, 87 *N.J.* 78 (1981); *N.J.S.A.* 34:13A–16(b), *N.J.S.A.* 34:13A–16(f)(4).

(1981), "[t]hat the discharge of a man is a change in his conditions of employment hardly needs comment." Accord, *Fibreboard Corp. v. N. L. R. B.*, 379 *U.S.* 203, 85 *S.Ct.* 398, 13 *L.Ed.2d* 233 (1964).

There is no question that subcontracting resulting in layoff or job displacement, otherwise known as substitutional subcontracting, intimately and directly affects the work and welfare of public employees, and no statute or regulation preempts the subject. Thus, the only question to be resolved is whether mandatory negotiation of the incidences of subcontracting would significantly interfere with the public employer's exercise of inherent managerial prerogative in determining governmental policy.

As the late Judge Morgan noted in her thoughtful dissent in the Appellate Division below, this case presents the classic conflict as described in *Board of Education of Woodstown-Pilesgrove Regional School District v. Woodstown-Pilesgrove Regional Education Association*, 81 *N.J.* 582 (1980). *Woodstown* directs that when a conflict arises a weighing or balancing must be made. *Id.* at 591.

To strike the balance between what is and is not significant interference, that Court said that when the dominant issue is a managerial prerogative, there is no obligation to negotiate. However, when the dominant issue is the legislative policy favoring a viable bargaining process to produce stability and efficiency in public employment, then bargaining is appropriate. *Woodstown, supra* at 591.

At oral argument, public employees' counsel conceded that the language of the clauses had to be modified to limit negotiation or discussion to situations in which public employee displacement by a private work force would occur solely for economic reasons. If the State were to make a decision to discontinue providing a service, if State employees lacked requisite skills to perform a

desired function, or if the decision to subcontract were entrepreneurial in nature, the subcontracting decision or its incidences would not be negotiable. Only when the subcontracting is motivated solely by economic considerations do the public employees seek to negotiate the incidences of the subcontracting.

While it may be true that the ultimate substantive question of whether to subcontract is predominantly an inherent managerial prerogative implicating an important policy decision, it is equally true that negotiating the incidences of that decision does not significantly interfere with the exercise of that prerogative.

The Appellate Division treated the contract provisions as requiring negotiation of the ultimate, substantive issue of subcontracting. While the language of the clauses is susceptible of that interpretation, the public employees actually sought the opportunity to negotiate what may be called the effects of a decision to subcontract. Such incidences may include, but are not limited to, procedural issues such as the amount of notice to be given prior to subcontracting, the timing of transfers or layoffs, and, in addition, the issue of give-backs, *i.e.*, whether public employees are willing to perform the same job at a price competitive with the private replacements.[2] Thus, the public employees sought a procedural right to present to the public employer the representative's position on the economic issue in the hopes of persuading the employer not to subcontract. The

---

[2]"Give-backs," employee concessions of wages and benefits, have rapidly become the mechanism through which employees try to cooperate with their industrial employers to prevent layoffs. With depressed economic circumstances causing workers to join the jobless ranks, news items recounting labor concessions appear daily. See, for example, *G.M. and Its Union Agree to Link Cut in Wages to Lower Car Prices*, N.Y. Times, January 13, 1982, at 1, col. 4; *Teamsters, Truckers Begin Talks Early; Some Assistance Seen for Ailing Industry*, Wall St.J., December 2, 1981, at 3, col. 3; *Teamsters Agree to Tentative Pack with Concessions*, N.Y. Times, January 16, 1982, at 1, col. 5; *Ford Lost $1.06 Billion Last Year but Union Pact Raises '82 Hopes*, N.Y. Times, January 19, 1982, at 1, col. 4.

situation that has arisen is the inevitable result of deciding negotiability in a vacuum.[3]

Taken in that context, the *Woodstown* balance should be struck favoring negotiability of the incidences of the decision to subcontract. Negotiation of the effects of the decision would not significantly interfere with the exercise of the inherent managerial prerogative. That prerogative is exercised in the making of the substantive decision itself. Conversely, the preeminent legislative policy favoring labor stability and efficiency would be served by allowing negotiation of the procedural effects of the decision on employees. It would also be served by allowing public employees to try to demonstrate that they could more efficiently and economically perform their tasks than could subcontractors.

Moreover, the subjects sought to be negotiated were well within the traditional guidelines for negotiability that we have suggested in the past. Negotiation on matters that intimately affect the work and welfare of public employees without significantly interfering with policy determinations is allowed. Thus, the Court has held that a contract interpretation as to whether or not a school board may unilaterally extend special education teachers' working hours without additional compensation was arbitrable, *Bd. of Ed. Englewood v. Englewood Teachers*, 64 *N.J.* 1 (1973), while on a broader scale school hours and school calendar were not negotiable, as the determination of the calendar is a major educational policy traditionally an exclusive responsibility of the college administration. *Burlington Cty. Col. Fac. Assoc. v. Bd. of Trustees*, 64 *N.J.* 10 (1973). Thus, the

---

[3]The contractual clauses requiring negotiation or discussion of the incidences of subcontracting have been included in the employment contracts for many years without notice of the disruption of state business. As noted by the majority, the State sought to remove the language from successor agreements on its own initiative. Failing to resolve the dispute, the parties filed a petition with PERC for a scope of negotiations determination. Thus, PERC and we are faced with deciding the case without the benefit of a developed factual record before us.

Court has mandated negotiation on the effects of a non-negotiable policy determination. The majority opinion itself points out, *ante* at 417, that

> Nonetheless, we have distinguished between substantive policy making powers of employers and procedural rights of employees. We have held that promotional procedures are negotiable terms and conditions of employment even though promotional criteria are not. *State v. State Supervisory Employees Assn.*, 78 *N.J.* at 90–91.

The private sector analogy, again, while not controlling, is instructive. In *First National Maintenance Corp., supra,* the interest of employees, the goals of the National Labor Relations Act, and the right of an employer to run his business are carefully balanced. The Supreme Court found that although the union was not permitted to participate in an employer's decision to shut down part of its business solely for economic reasons, it was, nonetheless, guaranteed a significant opportunity to bargain about the effects of the decision on job security. That Court reasoned that the union would be impelled to offer concessions, information, and alternatives that might be helpful to management or forestall or prevent the termination of jobs. 452 *U.S.* 666, 101 *S.Ct.* 2573, 69 *L.Ed.*2d at 332.

Similarly, in *International Ladies' Garment Workers U. v. N.L.R.B.*, 463 *F.*2d 907 (D.C.Cir.1972), the Court of Appeals decided that an employer was obliged to afford its employees an opportunity to meet legitimate complaints about labor costs before ousting them from their jobs and relocating the plant. And, finally, in *Van Buren Pub. Sch. Dist. v. Wayne Cty. Cir. J.,* 61 *Mich.App.* 6, 232 *N.W.*2d 278 (App.Ct.1975), the court considered the beneficial impact of collective negotiations on the government's proposal to contract out public work, saying:

> We are not convinced that bargaining would have served no purpose. The merits of Van Buren's decision to subcontract are not so clear as to eliminate the need for discussion. Union input might reveal aspects of the problem previously ignored or inadequately studied by Van Buren. The union may well be able to offer an alternative to the one chosen by Van Buren which would fairly protect the interests and meet the objectives of both. Surely discussion of the subject would have done much to "promote industrial peace" ... [E]xplanation at the bargaining table will sooner quell anger than receipt of a tersely worded termination slip. [232 *N.W.*2d at 288].

Provided that bargaining over the substantive issue itself is not mandated, negotiation of the incidences of subcontracting, as defined above, would not significantly interfere with an inherent managerial prerogative. Situations may arise in which the State may have a great need for speed, flexibility and confidentiality in meeting exigencies. Such would seem an inherent managerial decision and would not be subject to discussion or review. The refinement of the negotiable issues related to a decision to subcontract is more appropriately begun at the bargaining table than in a courtroom.

## II.

In addition to these analytical considerations of the application of the stated principles to the facts of this case, limiting public employee involvement in subcontracting decisions runs counter to the fundamental goals of our development of the law of public employment bargaining. I agree that democratic processes and accountability must be protected. *Ante* at 408. I suggest that in the long run this end will be better served by fostering discussions between the public employer and public employee.

Regardless of how the decision to subcontract is made, it is clear that substitutional subcontracting conflicts with the goal of maintaining democratic accountability in state government. That such accountability is vital to a functioning democracy is the fundamental premise of our decisions in public sector scope of negotiations cases. *Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed.*, 78 *N.J.* 144 (1978).

Most would agree that accountability is best ensured where elected or appointed officials exercise direct control over those who carry out state functions. It stands to reason that private workers are inherently less accountable than public employees. Their allegiance runs to their private employer. The "merit and

fitness" provisions of our Constitution and Civil Service Act[4] have no application to outside employees, even though they may work for a firm under contract with the State. Private employees may retain the right to strike. Further measures designed to encourage honorable service do not apply.

Moreover, the concern that negotiation on the issue of subcontracting would be "inimical to the democratic process," *ante* at 408, is not compelling when the interest at stake is the ability of an administrator unilaterally to substitute private employees for public ones in the absence of legislative authorization or agency rulemaking.

Although it is true that the troublesome efforts to comply with the rules and regulations of the Civil Service Commission may encourage some to seek alternative means to deliver state services,[5] our Constitution and laws do not contemplate the subcontracting of state services as a normal event. Art. VII, § I, par. 2 of our Constitution and *N.J.S.A.* 11:4–2 of the Civil Service Act mandate a system of public employment in which appointments and promotions are governed by a standard of "merit and fitness." Substitutional subcontracting conflicts to a substantial degree with these statutory and constitutional mandates.

The majority addresses this issue by citing two cases that upheld the legality of a *legislative* decision to exclude certain public employees from the civil service law. *Ante* at 406–407. These cases are of limited relevance here, however, where the issue is whether the negotiations would impair democratic processes by burdening an *administrative* decision to subcontract public employment.

---

[4]*N.J.Const.* (1947), Art. VII, § I, par. 2; *N.J.S.A.* 11:4–2.

[5]Reform of these laws has been urged. In the last session of the Legislature A–1859 passed the Assembly but expired in the Senate. It contains the first major substantive amendments to the Civil Service Act since the original Act of 1908.

I believe that negotiations on the incidences of fiscally motivated substitutional subcontracting would not significantly interfere with the exercise of an inherent managerial prerogative, but rather would promote labor harmony. I would reverse the Appellate Division judgments and direct the parties to negotiate the clauses within these guidelines.

*For affirmance in part and reversal in part*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER and POLLOCK—5.

*Concurring in part and dissenting in part*—Justices HANDLER and O'HERN—2.